**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

AUREL SMITH,

                              Plaintiff,

      v.                                                No. 11-CV-20
                                                      (MAD/DRH)

KENNETH PERLMAN, Deputy Commissioner of
Programs, NYS Department of Correctional
Services; MARK LEONARD, Director of Ministerial
Services, NYS Department of Correctional Services;
DANIEL MARTUSCELLO, Superintendent of
Coxsackie Correctional Facility; CAPTAIN R.
SHANLEY, Captain, Acting Deputy Superintendent
of Security at Coxsackie Correctional Facility;
SALTSMAN, Correctional Officer, Coxsackie
Correctional Facility; and MR. J. ADAMS,[1]
Correctional Officer, Coxsackie Correctional Facility,

                               Defendants.
_____

**APPEARANCES:**                             **OF COUNSEL:**

AUREL SMITH
Plaintiff Pro Se
02-A-6279
Auburn Correctional Facility
Post Office Box 618
Auburn, New York 13021

HON. ERIC T. SCHNEIDERMAN         CHRISTOPHER W. HALL, ESQ.
Attorney General for the                Assistant Attorney General
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

_____

      [1]According to defendants, this defendant's correct first name is "Todd."  Defs. Mem.
of Law (Dkt. No 24-1) at 4.

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff pro se Aurel Smith ("Smith"), an inmate in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action against six DOCCS employees alleging violations of the Civil Rights Act, 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA").  Am. Compl. (Dkt. No. 5).  Smith contends that defendants deprived him of his statutory rights to religious freedom as well as his constitutional rights under the First and Fourteenth Amendments.  Id.  Smith also asserts pendant state law claims for negligence against various defendants.  Id.

Presently pending is defendants' motion to dismiss certain claims and defendants pursuant to Fed. R. Civ. P. 12(b)(6).  Dkt. No. 24.  Smith opposes the motion.  Dkt. No. 26.  Also pending is Smith's motion to file a second amended complaint to add the State of New York as a defendant in the present action.  Dkt. No. 27.  For the following reasons, it is recommended that the defendants' motion be granted in part and denied in part.  It is further ordered that Smith's motion to amend be denied.

---

[2]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

## I. Background[3]

The facts are related herein in the light most favorable to Smith as the non-moving party. <u>See</u> seubsection II(A) <u>infra</u>.

## A. Family/Guest Participation Policy (Counts 1-3)

Smith is a practicing Muslim.  Am. Compl. ¶ 20.  Islaam has several holy days, two of which, the Eidul-Fitr and the Eidul-Adhaa ("the 'Eids"), are the basis of the current complaint.  <u>Id.</u>  ¶¶ 22-24.  Both 'Eids included a family/guest participation for many years until late 2007 when DOCCS changed its internal policy to limit the number of family/guest participation events to one per year.  <u>Id.</u>  ¶¶ 26-28; <u>see</u> <u>also</u> Dkt. No. 5-2 at 1 (showing policy in 1982 where both 'Eids were categorized as "communal feast[s] which [are] celebrated with family.").  Accordingly, since 2008, only one of the two aforementioned 'Eids could be celebrated with the family members or guests of the inmates.  Am. Compl. ¶ 28; <u>see</u> <u>also</u> <u>Id.</u> ¶¶ 34-35 (Eidul-Adhaa celebrations in January 2009 and December 2010 occurred without family/guest participation), ¶ 36 (Eidul-Adhaa celebration in 2011 not scheduled as a family/guest participation event); Dkt. No. 5-1 at 12-16 (religious calendar for 2008); Dkt. No. 5-1 at 17-20 (religious calendar for 2007); Dkt. No. 5-3 (religious calendar for 2010); Dkt. No. 5-2 at 2-4 (religious calendar for 2011).

However, no similar limitation was instituted for the number of Native American religious

---

[3] Smith attached, and cited to, additional exhibits in his amended complaint. Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007).  As the documents were both attached and incorporated in the amended complaint, they have been considered in determining the present motion.

services which allowed family participation in at least nine religious services.  Am. Compl. ¶ 29; see also Id. ¶ 37 (noting that Native American celebrations all still accommodate family/guest participation); Dkt. No. 5-1 at 16 (allowing family participation for all Native American celebrations in 2008); Dkt. No. 5-1 at 20 (same for all Native American celebrations in 2009); Dkt. No. 5-3 at 19 (same for all Native American celebrations in 2010); Dkt. No. 5-2 at 2-4 (same for all Native American celebrations in 2011).  Smith submitted letters of complaint to various DOCCS officials.  Id.  ¶ 32; Dkt. No. 5-2 at 5.  On January 15, 2009, defendant Kenneth Perlman, DOCCS Commissioner of Programs, responded to Smith's letter of complaint, directing him to file a formal grievance[4] to the facility so that his concerns could be addressed.  Am. Compl. ¶ 33; Dkt. No. 5-2 at 6.

Smith also filed a grievance concerning the disparity between the family/guest participation allowed in each respective religious organization.  Am. Compl. ¶ 30; Dkt. No. 5-1 at 1-2.  An investigative report was submitted to the Inmate Grievance Resolution Committee ("IGRC") detailing that the investigator spoke with the facility's Islamic spiritual advisor, the Imam, who explained "that in past years family events were scheduled for both 'Eids but this policy was changed.  As per directive there is only one family event allowed by each religious group with exception of Native Americans."  Dkt. No. 5-2 at 8.  As the Imam was not involved with decisions about facility policies, and because the policy at issue here had already been determined, further discussion with the Imam was not deemed necessary

---

[4]"The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

by DOCCS.  Id.  The IGRC deadlocked on the issue and it was automatically appealed to

the Superintendent.  Am. Compl.  ¶ 41; Dkt. No. 5-2 at 9-10 (IGRC decision).  According to

Smith, part of the IGRC's decision was based on comments by defendant Leonard, DOCCS

Director of Ministerial Services, that "family participation [wa]s not mandatory for [the 'Eid's]

observance."  Am. Compl. ¶ 41.  However, the IGRC decision outlines that it was denied by

the Staff Representatives pursuant to facility policy allowing "one family event . . . per

religious organization."  Dkt. No. 5-2 at 10.  Regardless, Smith disagrees with the

proposition that family is not integral to the 'Eid's observance.  Am. Compl.  ¶ 42; but see

Id.  ¶ 141 ("[A]lthough family participation in 'Eid observances need not be mandatory or

obligated, their participation . . . is integral to the celebration of both 'Eids and participation

therein is an obligation on family members as well as the Muslim prisoners themselves.");

Dkt. No. 5-1 at 5, 7 (excerpts from religious text stating that attending prayer services is an

individual obligation of each Muslim); Dkt. No. 5-1 at 9 (excerpt from religious text outlining

importance of Muslims to meet with family and friends during religious times, but

emphasizing that visitation is "permissible, and . . . recommended . . . .").

The Superintendent denied the grievance, noting that

> [p]er Ministerial Services, [the] Central Office allows one family
> event per year, with the exemption of the Native American faith
> group.  A Native American religious ceremony is observed with a
> family meal.  The other religions do not require a family meal as
> part of the religious observance.  Other religious holidays can be
> observed without a family event scheduled.

Dkt. No. 5-2, Am. Compl. ¶ 44 (substantially the same recitation of the Superintendent's

denial); see e.g. Dkt. No. 5-3 (showing full calendar for all religious events in 2010 and

illustrating that every religion, except Native Americans, were limited to, at most, one

5

family/guest participation event per year); Dkt. No. 5-2 at 2-4 (same for 2011).  Smith appealed the denial and CORC upheld the Superintendent's determination, emphasizing again that while only one 'Eid is now a family event, both are equally acknowledged and celebrated as holy days on the religious calendar.  Am. Compl. ¶¶ 45-46; Dkt. No. 5-2 at 13-16.

On January 20, 2009, Smith again wrote to Perlman complaining about the guest participation disparities.  Am. Compl. ¶ 48; Dkt. No. 5-2 at 17-18.  On February 2, 2009, non-party Karen Bellamy responded to Smith's letter on Perlman's behalf.  Am. Compl. ¶ 48; Dkt. No. 5-2 at 19.  On January 31, 2009, Smith again wrote to the Commissioner and received a response from Perlman on the Commissioner's behalf, informing him that there were no plans to change the policy for guests participating in religious events.  Am. Compl. ¶ 50; Dkt. No. 5-2 at 20-23.  Smith claims that Perlman and Leonard were responsible for either the change in the department policy, or the maintenance of it, and that it should have been modified to allow Muslims to have both 'Eids include family or guest participation.  Am. Compl., Count One.

## B. Friday Religious Services (Counts 4-5)

Every Friday, religious services were held for Islamic inmates.  Am. Compl. ¶¶ 55-56. While in the general population, Smith attended these services weekly.  Id.  ¶ 57.   In July 2009, Smith received a misbehavior report for allegedly threatening an unnamed corrections officer.  Id.  ¶ 65.  On August 1, 2009, Smith was removed from the general

population and placed in keeplock[5] pending his disciplinary hearing.  Id. ¶ 66.  Smith was

found guilty at the hearing and given confinement in keeplock for thirty days until

September 1, 2009.  Id. ¶ 72.

While in keeplock, inmates were required to ask permission, via a special DOCCS form,

to attend weekly religious services.  Am. Compl. ¶ 66; Dkt. No. 5-2 at 27.  Smith contends

that if permission was denied, DOCCS was required to provide an explanation for said

denial via the form.[6]  Am. Compl. ¶ 69; Dkt. No. 5-2 at 32.  While Smith did not seek

permission to attend services the first Friday he was keeplocked, he did seek permission

each of the following three weeks.  Am. Compl. ¶ 73.  Smith sent these requests to

defendant Martuscello, the Coxsackie Superintendent, who then forwarded them for

decision m to defendant Shanley, the Coxsackie Acting Deputy Superintendent of Security.

Am. Compl. ¶ 76.  The requests were all denied.

Specifically, the first Friday Smith sent both the DOCCS form seeking permission to

attend services and an additional letter to Martuscello outlining his continued right to attend

religious services despite being keeplocked.  Am. Compl. ¶¶ 78-79.  Martuscello never

responded to Smith's letter, though he forwarded the request to Shanley who denied it

---

[5]"Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities."  Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6 (2007).

[6] Smith attached a copy of the permission form to his amended complaint.  Dkt. No. 5-2.  The form has two check boxes, one that indicates that permission is granted, and the other that permission is denied.  Id.  In the case that permission is denied, the form indicates that an explanation is required as to "why the inmate's presence would present a threat to the operation of the facility."  Id.  Considerations include the current infraction for which the inmate is being disciplined, his adjustment during the period of segregated confinement, and his disciplinary record in the past six months.  Id.  There is then additional space for the officer to note the reasons for dismissal.  id.

based on Smith's misbehavior report and disciplinary conviction for threatening an officer. Id. ¶¶ 79-80. Shanley indicated, by circling two of the three considerations, that Smith's current infraction and disciplinary record were reasons for the denial of his request. Id. ¶ 80. Shanley also wrote that Smith "[W]as given a misbehavior report for threats," in the space below the enumerated criteria for consideration. Id.

In response, Smith wrote another letter to Martuscello, complaining that Shanley's reason denying his participation was insufficient. Am. Compl. ¶ 81. In addition, Smith enclosed another form seeking permission to attend the next week's religious services. Id. ¶ 82. Martuscello again failed to reply to the letter, forwarded the request to Shanley, who again denied permission citing the same reasons as before. Id. ¶¶ 83-85. Smith again wrote to Martuscello, complaining about the adequacy of Shanley's denials. Id. ¶ 86. Smith also submitted his third, and final, request for permission to attend the following week's religious services. Id. ¶ 87. Again, Shanley received, and denied, Smith's requests. Id. ¶¶ 89-91. However, this time Shanley only circled the considerations of Smith's current infraction and disciplinary record and did not include a further notation to explain why permission was denied. Id. ¶ 91.

Smith filed a grievance regarding Shanley's repeated denials. Am. Compl. ¶ 94. The IGRC denied Smith's grievance, which was later upheld by Martuscello. Id. ¶ 95. Smith disputed the validity of Shanley's denials because Smith was serving a minor sentence, was due to return to general population and thus was not a long-term threat, and was not attending services with or near the individual that he allegedly threatened. Id. ¶ 104. Smith also contends that "Martuscello and Shanley maintained a practice  not to allow any keeplocked prisoner attendance at religious services whatsoever," as it was his belief that

no keeplocked prisoners attended religious services from January 2009 through July 2010.
Id. ¶¶ 101, 107, 159.

### C. Saturday Islamic Studies Class

Smith attended an Islamic Studies class regularly on Saturday afternoons.  Am. Compl.
¶ 109.  To attend, Smith needed to be on a list.  Id.  ¶ 110.  On February 6, 2010, Smith
was on this list and was scheduled to attend.  Id.  ¶¶ 111, 113.  Defendants Saltsman and
Adams, both corrections officers, were working on Smith's unit that day.  Id.  ¶ 113.  At the
time of the class,, Smith spoke with Saltsman as he was passing by Smith's cell.  Id.  ¶ 115.
Saltsman acknowledged that Smith had permission to attend the class but did not release
Smith from his cell.  Id.  ¶ 116.

Shortly thereafter, Adams released other inmates from their cells for the law library.  Am.
Compl. ¶ 117.  Smith called out to Adams, informing him of his call out for his religious
group.  Id.  ¶ 118.  Adams also acknowledged that the group was being held and did not
dispute Smith's permission to attend said course but never released Smith for the class.
Id.  ¶¶ 119-20.

Smith filed a grievance against Saltsman and Adams for failing to release him from his
cell for the class.  Am. Compl. ¶ 122; Dkt. No. 5-2 at 36-38.  Smith was interviewed in
conjunction with the grievance and was told that neither Saltsman or Adams denied failing
to release him, but instead the investigator surmised that defendants "may have mistakenly
failed to [release him]."  Am. Compl. ¶¶ 123-24.  Both officers claimed not to recall the
event.  Id. ¶ 135.  The grievance was denied and subsequently appealed.  Dkt. No. 5-2 at
39.

9

## II.  Discussion

In his amended complaint, Smith alleges that his First Amendment rights were violated when defendants prohibited him from attending three religious Friday services, a Saturday religious study group, and changed the policy to allow only one 'Eid to have family participation.  Smith also asserts a Fourteenth Amendment violation because he was unable to attend religious services while keeplocked and because Muslims were treated differently than Native Americans concerning the number of family/guest participation events they were allowed annually.  Smith also seeks to add the State of New York as a defendant in the present complaint.  Defendants move for dismissal on the grounds that (1) Perlman, Leonard and Martuscello lacked personal involvement in the alleged constitutional violations; (2) the constitutional claims are meritless; (3) the RLUIPA claims are also meritless; and (4) the state claims are precluded by Corrections Law § 24.

## A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim.  When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  However, this "tenet . . . is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . [as] courts are not bound to

10

accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility . . . that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (citations omitted).  Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950-51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they 'suggest. . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . or arguments that the submissions themselves do not "suggest, . . ." that we should not "excuse frivolous or vexatious filings by pro se litigants" . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).


**B. Personal Involvement**

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d

Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

supervisory officials may not be held liable merely because they held a position of authority.

Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may

be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional
> violation;
>
> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance of
> such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).[7]

---

[7]  Various courts in the Second Circuit have considered how, if at all, the Iqbal
decision affected the five Colon factors which were traditionally used to determine
personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343
(DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the
Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several

**1. Perlman**

Perlman is the Deputy Commissioner of Programs.  In this capacity, he responded to Smith's complaints about the changes to the family/guest participation events.  While the first response merely directed Smith to file a formal grievance at the facility level, an action insufficient to establish personal involvement, the second response indicated that there were no plans to reinstate an additional family event.  Perlman also authored the memoranda distributed to the various Superintendents at the DOCCS facilities which outlined the religious calendar and the number and dates of the family/guest participation events.  Dkt. No. 5-3 at 1.  Accordingly, in light of Perlman's letter and memoranda and viewing the evidence in the light most favorable to Smith, it appears that Perlman was involved in at least the continuation of the allegedly unconstitutional policy.  See  Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."); McClary v. Coughlin, 87 F. Supp. 2d 205, 215 (W.D.N.Y. 2000) ("Personal involvement does not hinge on who has the ultimate authority for constitutionally offensive decisions.  Rather, the proper focus is the defendant's direct participation in, and connection to, the constitutional deprivation.").  Accordingly, Smith has alleged sufficient facts to demonstrate that Perlman was directly involved with the implementation and continuation of the alleged unconstitutional policy.

---

district courts have done so); Kleehammer v. Monore County, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Defendants' motion on this ground as to Perlman should be denied.


## 2. Leonard

Leonard was the Director of Ministerial Services, allegedly informed individuals during the grievance decisions how the religious policy regarding family/guest participation operated, and expressed his understanding of its continued existence in the future. Documents attached to the complaint show that Ministerial Services was contacted, and provided guidance, to CORC when it was asked to issue a decision for Smith's grievance. Dkt. no. 5-2 at 12. Accordingly, as with Perlman, viewing the facts alleged in the amended complaint in the light most favorable to Smith, Smith has alleged sufficient facts to deem Leonard directly involved with the implementation and continuation of the policy. Therefore, defendants' motion on this ground as to Leonard should be denied.


## 3. Martuscello

As the Superintendent of Coxsackie, Martuscello failed to respond to Smith's letters of complaint regarding his denied requests for permission to attend religious Friday services while keeplocked. Failure to respond to letters is insufficient to establish personal involvement. Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."). Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y.2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 ("While mere receipt of a letter from a prisoner is

insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

Moreover, Martuscello's actions in forwarding Smith's requests for permission to attend religious activities to Shanley is also insufficient to establish personal involvement because it is within the purview of a superior officer to delegate responsibility to others.  See Vega v. Artus, 610 F. Supp. 2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation.") (citing Ortiz-Rodriquez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y.2007)).

Lastly, Martuscello's actions in denying Smith's two grievance appeals, regarding isolated and unrelated incidents relating to Shanley's refusal to allow him to participate in three Friday services and Saltsman's and Adam's failure to take him to his Saturday religious studies group, are also insufficient to state a claim for personal involvement.  Both of these grievances relate to "alleged misconduct [that] had already occurred . . . [as opposed to] complaining about an 'ongoing' violation."  Harnett v. Barr, 538 F. Supp. 2d 511, 524-25 (N.D.N.Y. 2008).  Without more, the requirement for personal involvement has not been satisfied.  Id.

Martuscello cannot otherwise be deemed personally involved for his position in a hierarchical chain of command.  Wright, 21 F.3d at 501.  Moreover, the amended complaint fails to allege, and Smith offers no evidence other than conclusory statements, that Martuscello failed to train any of the defendants.  Finally, for the same reasons as cited above, Smith has failed to establish that Martuscello was grossly negligent or aware, and

15

indifferent to an ongoing constitutional violation.

Accordingly, defendants' motion as to Martuscello should be granted on this ground.

## C. First Amendment

The First Amendment protects the right to free exercise of religion.  See generally Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).   This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

## 1. Attendance at the Friday Services

""[P]risoners have a constitutional right to participate in congregate religious services."

16

Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted).  "Confinement in keeplock does not deprive prisoners of this right."  Id. (citations omitted).  While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted).   "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted).  The same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice."  Ford, 352 F.3d at 595 n.15 (citations omitted).

Defendants contend that Smith's religious beliefs were not substantially burdened if he was denied attendance at three Friday prayer services.  The Supreme Court has previously recognized the importance of these Friday services, explaining that they are "commanded by the Koran and must be held . . . after the sun reaches its zenith and before the . . . afternoon prayer."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 345 (1987); see also Salahuddin, 993 F.2d at 307 ("Participation in Jumu'ah [the Muslim Friday prayer service,] is the central observance of Islam.").  Accordingly, significant importance attaches to the prayer services.

However, some courts have determined that individual prayer is adequate to fulfill a Muslim's prayer obligations and that legitimate excusals from prayer services do not substantially burden religious beliefs. See Abdur-Rahman v. Michigan Dep't of Corr., 65

F.3d 489, 492 (6th Cir. 1995) (concluding that because "the Islamic religion expressly excuses individuals who are in prison for good cause [and that] . . . Friday services are not fundamental to [the Islamic] religion . . . " no substantial burden had occurred); Boomer v. Irving, 963 F. Supp. 227, 230-31 (W.D.N.Y. 1997) (explaining that "two Muslim Imams [testified] . . . that an inmate's failure or inability to attend one [prayer] service does not substantially interfere with the inmate's obligations as a practicing Muslim because those obligations may be fulfilled by individual prayer offerings with no adverse consequences."). Smith continually stresses that the deprivation of attending the three services substantially burdened him, but fails to articulate why or how. Pl. Mem. of Law (Dkt. No. 26) at 11. However, construing the facts in the light most favorable to Smith it may be determined that by missing three consecutive religious services a substantial burden occurred.

Regardless l of this burden, Smith has failed to allege or prove that the denial of his requests for permission to attend three Friday services while in keeplock was unreasonable and thus in contravention of his constitutional rights. In this case, the regulation requiring Smith to seek and receive permission to attend services only if the inmate did not pose a security risk is reasonably related to one of the most important prison objectives of maintaining order and safety in the correctional institutions. Smith was denied permission to attend the services for the same reasons which led to his keeplock confinement, that he had threatened a corrections officer and received a disciplinary confinement for such actions. Accordingly, defendants Martuscello and Shanley acted pursuant to legitimate penological concerns. Defs. Mem. of Law (Dkt. No. 24-1) at 12-13. Furthermore, the Muslim faith allows "excuse[s] from Friday services for [legitimate] reasons . . . ." which would include releases precluded because of security risks. Abdur-Rahman, 65 F.3d at

18

491-92 (dismissing inmate's First Amendment claims when his requests to leave his work

assignment to attend religious services was denied due to the resulting security threat);

Boomer, 963 F. Supp. at 230-31.

Defendants' motion on this ground should be granted.


## 2. Attendance at Saturday Religious Studies Group

Smith also contends that Saltsman and Adams violated his First Amendment rights

when they failed take him fro keeplock to one meeting of a Saturday religious study group.

Defendants contend that denying Smith attendance at one isolated religious study group

session is insufficient to burden Smith's religious rights.

A substantial burden requires more than a mere inconvenience to an inmate's religious

beliefs. Boomer, 963 F. Supp. at 230 (citations omitted); see also Salahuddin, 467 F.3d at

275 (citations omitted). Missing one religious service does not constitute a substantial

burden on an inmate's right to practice his religion. See Cancel v. Mazzuca, 205 F. Supp.

2d 128, 142 (S.D.N.Y. 2002) (granting motion to dismiss against defendant that prevented

inmate from attending religious services on one occasion); Boomer, 963 F. Supp. at 230-31.

The Second Circuit has also affirmed this, concurring that missing one religious service was

insufficient to state a First Amendment claim. Gill v. DeFrank, 8 Fed. Appx. 35, 37 (2d Cir.

2001) (attached to Report-Recommendation as Ex. 1). It is arguable whether a religious

study group session is afforded the same deference as a religious service as it is informal

by its nature and has not been identified as being a part of, or comparable to, a recognized

religious service. Regardless of its significance, the actions of Stalsman and Adams in

precluding Smith from attending one meeting of the religious study group was at most an

19

inconvenience which is insufficient to establish a substantial burden.

Therefore, defendants' motion as to this claim should be granted on this ground.


### D. RLUIPA Claim

The RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution . . . unless
> the government demonstrates that imposition of the burden on that
> person (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc-1.  In a RLUIPA claim, "[t]he prisoner must show at the threshold that

the disputed conduct substantially burdens his sincerely held religious beliefs.  The

defendants then bear the relatively limited burden of identifying the legitimate penological

interests that justify the impinging conduct."  Salahuddin, 467 F.3d at 274-75.

> Congress, in enacting the RLUIPA, anticipated that Courts would
> give "due deference to the experience and expertise of prison and
> jail administrators in establishing necessary regulations and
> procedures to maintain good order, security and discipline,
> consistent with consideration of costs and limited resources.
> Nevertheless, prison officials cannot simply use the words
> "security" and "safety", and expect that their conduct will be
> permissible.

Singh v. Goord, 520 F. Supp. 2d 487, 499 (S.D.N.Y. 2007) (internal citations omitted).

As discussed above, even construing the facts in the light most favorable to Smith, he

has failed to allege facts sufficient to establish that (1) Martuscello and Shanley's actions

were not supported by a legitimate penological interest and (2) defendants Saltsman and

Adams' conduct substantially burdened his religious beliefs and practices.  Accordingly,

defendants' motion on this ground should be granted as to this claim.

20

**E. Fourteenth Amendment**

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas, 610 F. Supp. 2d at 209 (internal quotation marks and citations omitted).  However, "[t]he Supreme Court has specifically held that in the prison context, the Equal Protection clause does not require that every religious sect or group within a prison . . . have identical facilities or personnel." Pugh v. Goord, 571 F. Supp. 2d. 477, 502 (S.D.N.Y. 2008) (internal quotation marks and citations omitted). Thus, even if Smith alleges that two groups were similarly situated, disparate treatment may still have been permissible if the distinctions were reasonably related to legitimate penological interests.  Id.

In this case, Smith claims that his equal protection rights were violated when he was not allowed to attend Friday services on three occasions when general population inmates were allowed to attend.  Also, Smith alleges his rights were generally violated because Martuscello and Shanley were believed to never allow keeplocked inmates to attend religious services.  Smith has failed to allege an equal protection claim.  First, Smith was not

21

similarly situated to the inmates in the general population because he had been adjudged guilty of a disciplinary charge which resulted in confined housing.  Second, Smith was not the subject of intentional discrimination.  As previously discussed, he was precluded from attending the services for legitimate penological reasons which had nothing to do with Smith's religious affiliation.  Third, Smith's claims that all keeplocked inmates were prevented from ever attending any religious services are conclusory and unsupported. Smith fails to identify the other inmates to whom he refers, their religious affiliations, or from which services they were denied attendance.  Accordingly, Smith has failed to establish the necessary elements of an Equal Protection claim.

Defendants' motion as to this claim should be granted.

### F. State Law Claims

Smith's amended complaint also asserts that Martuscello, Saltsman, and Adams were all negligent in their actions.  However these claims fail as a matter of law.  New York Correction Law § 24 provides that

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

"Section 24 thus precludes claims against corrections officers brought against them in any

22

court in their personal capacities arising out of the discharge of their duties." Crump v. Ekpe, No. 07-CV-1331, 2010 WL 502762, at *18 (N.D.N.Y. Feb. 8, 2010) (citations omitted) (Attached to Report-Recommendation as Ex. 2).

Because a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court. Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996).

> In 2009, the United States Supreme Court held that § 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions. However, at least two judges in this District have observed that because Haywood's focus is on concerns about civil rights claims and the Supremacy Clause, the decision does not affect the question of whether this Court has proper jurisdiction to hear a pendent state law claim.

Tafari v. McCarthy, 714 F. Supp. 2d 317, 384 (N.D.N.Y. 2010) (internal quotation marks and citations omitted). Accordingly, this district has continued to dismiss state law pendent claims against defendants acting within their personal capacities, discharging their duties, pursuant to the preclusive effects of § 24. See e.g., Crumpe, 2010 WL 502762, at *18.

When determining whether actions fall within the scope of the defendants employment, courts have considered:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of the departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

Degrafinreid v. Ricks, 452 F. Supp. 2d 328, 333 (S.D.N.Y. 2006) (citations omitted). Thus, "an employee will be considered within the scope of his employment so long as he is

discharging his duties no matter how irregularly, or with what disregard of instructions."  Id. (citations omitted).  Even in cases where alleged excessive force was used in frisking or searching a cell, or where negligence was alleged in the provision of medical care, such actions are still defined to be within an employee's duties.  Id. (citations omitted); see also Crump, 2010 WL 502762, at *18 (listing DOCCS employee duties to include "determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged," and explaining that while actions "exceeding the scope of the corrections officer's authority . . . ." may give rise to a constitutional violation, such actions are still precluded pursuant to § 24).

With respect to the defendants making the present motion, all of their purported actions fall within their assigned duties.  Martuscello's actions in denying grievances and making determinations on the whereabouts of inmates all fell within his assigned duties as a Superintendent.  The same is true of Shanley's discretion in granting or denying Smith permission to attend religious services and Saltsman's and Adams' duties in running the housing floor and assembling inmates for call outs.  Thus, § 24 prohibits the advancement of any pendent state law claims.  While these defendants' actions may be cited as the alleged cause of a constitutional violation, it is insufficient to remove this action from the bar of § 24.

Accordingly, defendants' motion should be granted on this ground as to Smith's state law claims against the moving defendants.

### III. Motion to Amend

Rule 15(a) provides that a court should grant leave to amend "freely . . . when justice so requires."  When exercising its discretion, a court must examine whether there has been undue delay, bad faith, or dilatory motive on the part of the moving party.  Evans v. Syracuse City School District, 704 F.2d 44, 46 (2d Cir. 1983) (citing Foman, 371 U.S. at 182).  The court must also examine whether there will be prejudice to the opposing party.  See, e.g., Ansam Associates Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985) (permitting proposed amendment would be especially prejudicial once discovery has been completed and a summary judgment motion filed).  Finally, where it appears that granting leave to amend is unlikely to be productive or the amendment is futile, it is not an abuse of discretion to deny leave to amend.  Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted).

In this case, granting Smith's liberally construed request to amend his complaint to add New York State as a defendants is futile under the Eleventh Amendment.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.

25

Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).  Therefore, the Eleventh Amendment bars suit against the State of New York.

Moreover, in the case of proposed amendments where new defendants are to be added, the Court must also look to Fed. R. Civ. P. 21.  Rule 21 states that a party may be added to an action "at any stage of the action and on such terms as are just."  Rule 21 is "intended to permit the bringing in of a person, who through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable."  United States v. Commercial Bank of N.A., 31 F.R.D. 133, 135 (S.D.N.Y. 1962) (internal quotations omitted).  Addition of parties under Rule 21 is also guided by the same liberal standard as a motion to amend under Rule 15.  Fair Housing Dev. Fund Corp. v. Burke, 55 F.R.D. 414, 419 (E.D.N.Y. 1972).

As previously stated, the State of New York is neither a necessary or desirable party as all claims against it are futile.  Thus, as the liberal standard of Rule 15 precludes the addition of the State as a defendant, so does Rule 21.  Accordingly, Smith's motion to amend is denied on this ground.


## IV.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 24) be:

1. **GRANTED** as to

    A. The First Amendment and RLUIPA claims against  Martuscello and Shanley for denying Smith attendance at Friday religious services;

B.  The First Amendment and RLUIPA claims against defendants Saltsman and Adams for denying Smith attendance at Saturday's religious study group;

C.  The Equal Protection claims against Martuscello and Shanley for precluding Smith, and the other keeplocked inmates, from attending religious services; and

D.  Smith's state law negligence claims against Martuscello, Saltsman, and Adams; and

2. **DENIED** in all other respects; and

**IT IS HEREBY ORDERED** that Smith's motion for leave to file a second amended complaint (Dkt. No. 27) is **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  February 28, 2012
        Albany, New York

_____
United States Magistrate Judge

27

Re 11 cv20

Westlaw.

8 Fed.Appx. 35, 2001 WL 388057 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 8 Fed.Appx. 35, 2001 WL 388057 (C.A.2 (N.Y.)))**

This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Anthony G. GILL, Plaintiff-Appellant,
v.
Janice DeFRANK, R.N., Woodbourne C.F.; Elizabeth R.N., Woodbourne C.F.; C.O. S. Stenros, Woodbourne C.F.; Sgt. Tybrowski, Woodbourne C.F.; Sgt. I. Spafford, Woodbourne C.F., Defendants-Appellees.

No. 00-0235.
April 16, 2001.

Prisoner brought § 1983 action against prison medical personnel and correctional officers. The United States District Court for the Southern District of New York, Naomi Reice Buchwald, J., adopted in part and modified in part the report and recommendation of Andrew J. Peck, United States Magistrate Judge, and granted summary judgment in favor of defendants. Prisoner appealed. The Court of Appeals held that: (1) **missing one religious service was not a substantial burden** on prisoner's right to the free exercise of his religion, and (2) defendants were entitled to qualified immunity on prisoner's **First Amendment** and invasion of privacy claims.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ☞1427**

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(B) Particular Issues and Applications
            92k1421 Prisons and Pretrial Detention
                92k1427 k. **Religious Services** and Ceremonies; Study and Prayer Groups. Most Cited Cases
    (Formerly 92k84.5(14))

**Prisons 310 ☞155**

310 Prisons
    310II Prisoners and Inmates
        310II(B) Care, Custody, Confinement, and Control
            310k151 **Religious** Practices and Materials
                310k155 k. **Services**, Ceremonies, Texts, Study, and Prayer. Most Cited Cases
    (Formerly 310k4(14))

**Missing** one **religious service** was **not a substantial burden** on inmate's right to the free exercise of his religion and, thus, prison medical personnel and correctional officers did **not substantially burden** his **First Amendment** free exercise rights. U.S.C.A. Const.Amend. 1.

**[2] Civil Rights 78 ☞1376(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
    (Formerly 310k10)

Prison medical personnel and correctional officers were entitled to qualified immunity on inmate's **First Amendment** claim; given disagreement among district courts, as to whether **missing a** single **religious service** constituted a violation of **religious** rights, it could **not** be said that the law was "clearly established" at the time of the relevant events. U.S.C.A. Const.Amend. 1.

**[3] Civil Rights 78 ☞1376(7)**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EX. 1

8 Fed.Appx. 35, 2001 WL 388057 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 8 Fed.Appx. 35, 2001 WL 388057 (C.A.2 (N.Y.)))**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
    (Formerly 310k10)

**Prisons 310 ⟞⟝400**

310 Prisons
    310V Officers and Employees
        310k398 Liabilities
            310k400 k. Immunity. Most Cited Cases
    (Formerly 310k10)

    Prisoner's right to privacy regarding his HIV status was not clearly established law when he asserted claim against prison medical personnel and correctional officers and, thus, medical personnel and officers were entitled to qualified immunity on invasion of privacy claim.

*36 Appeal from the United States District Court for the Southern District of New York, Naomi Reice Buchwald, Judge.Anthony G. Gill, pro se.

Eliot Spitzer, Attorney General of the State of New York; Michael S. Belohlavek, Deputy Solicitor General, Marion Buchbinder and Sachin S. Pandya, Assistant Solicitors General, Of Counsel, on the brief, New York, NY, for appellees.

Present NEWMAN, PARKER, and SACK, Circuit Judges.

SUMMARY ORDER

**1 UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the decision of said District Court be and it hereby is AFFIRMED.

    Plaintiff-Appellant Anthony G. Gill appeals from the district court's July 6, 2000 memorandum and order adopting in part and modifying in part Magistrate Judge Peck's March 9, 2000 Report and Recommendation, and granting summary judgment in favor of Defendants Appellees on all of his claims. Gill brought this action in 1997 pursuant to 42 U.S.C. § 1983. In his complaint, Gill alleged that in May 1997, Defendants-Appellees, who are medical personnel and correctional officers at Woodbourne Correctional Facility, violated his **First Amendment** free exercise rights by refusing his request to attend a Jehovah's Witness **religious service**, violated his Eight Amendment right to be free from cruel and unusual punishment by ordering him to perform work which was contrary to his posted medical restrictions, violated his constitutional right to privacy by disclosing his HIV status to non-medical personnel, and violated his due process rights by filing a false misbehavior report against him in retaliation for his lodging a prison grievance against Defendant-Appellee DeFrank and other staff members. Gill also alleged numerous state law claims.

    Upon Defendants-Appellees' motion for summary judgment, Magistrate Judge Peck filed a report and recommendation on March 9, 2000 in which he recommended that the motion be granted with respect to Gill's Eighth Amendment, retaliation, and due process claims, and that the motion be denied with respect to Gill's **First Amendment** claim, his privacy claim, and his state law claims. *Gill v. DeFrank,* No. 98 Civ. 7851JSRAJP, 2000 WL 270854, at *1 (S.D.N.Y. March 9, 2000).

    [1] In a memorandum and order dated July 6, 2000, the district court adopted in part and modified in part the report and recommendation. *Gill v. DeFrank,* No. 98 **37** Civ. 7851(NRB), 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000). The court adopted the report as to the claims on which it granted Defendants-Appellees' motion, but modified the report with respect to the **First Amendment** and privacy claims, granting summary judgment on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 Fed.Appx. 35, 2001 WL 388057 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 8 Fed.Appx. 35, 2001 WL 388057 (C.A.2 (N.Y.)))**

those claims as well. *Id.* With respect to Gill's **First Amendment** claim, the court concurred with holdings in other district courts which held that " **missing** one **religious service** does **not** constitute a **substantial burden** on an inmate's right to the free exercise of his religion. Accordingly, as Gill **missed** only one **service**, defendants did **not substantially burden** his free exercise rights and his claim should be dismissed." *Id.* at *2 (internal citations omitted). The court further concluded that Defendants-Appellees are entitled to qualified immunity on the **First Amendment** claim because, "insofar as there had been disagreement [as of May 1997] among district courts, as to whether **missing** a single **religious service** constitutes a violation of **religious** rights, it cannot be said that the law was 'clearly established' at the time of the relevant events." *Id.* (internal citation omitted). With respect to Gill's privacy claim, the court concluded that "Gill's right to privacy regarding his HIV status was not clearly established law in 1997, and thus defendants are entitled to qualified immunity on this claim." *Id.* at *3. Finally, the court dismissed Gill's pendent state law claims and closed the case. *Id.* at *3-4.

**\*\*2** [2][3] We review the district court's order granting summary judgment de novo and focus on whether the district court properly concluded that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. *Allstate Ins. Co. v. Mazzola,* 175 F.3d 255, 258 (2d Cir.1999). Having conducted such a review, we conclude that summary judgment on all claims was warranted, and affirm, for substantially the same reasons as stated in the Magistrate Judge's report and recommendation as to the claims for which the Magistrate Judge recommended dismissal, 2000 WL 270854 at *1, and in the district court's memorandum and order, 462 Mich. 591, 614 N.W.2d 88, 2000 WL 987152 at *1.

For the reasons set forth above, the judgment of the district court is AFFIRMED.

C.A.2 (N.Y.),2001.

Gill v. DeFrank
8 Fed.Appx. 35, 2001 WL 388057 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

// cv 20

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Robert CRUMP, Plaintiff,
v.
Ekpe D. EKPE, et al., Defendants.

No. 9:07-CV-1331 (LEK/DEP).
Feb. 8, 2010.

Robert Crump, Middletown, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, Susan C. Von Reusner, Esq.,
Asst. Attorney General, of Counsel, Albany, NY,
for Defendants.

*DECISION AND ORDER*
LAWRENCE E. KAHN, District Judge.

  *1 This matter comes before the Court follow-
ing a Report-Recommendation filed on January 19,
2010, by the Honorable David E. Peebles, United
States Magistrate Judge, pursuant to 28 U.S.C. §
636(b) and L.R. 72.3(c) of the Northern District of
New York. Report-Rec. (Dkt. No. 30).

  Within ten days, excluding weekends and holi-
days, after a party has been served with a copy of a
Magistrate Judge's Report-Recommendation, the
party "may serve and file specific, written objec-
tions to the proposed findings and recommenda-
tions," FED. R. CIV. P. 72(b), in compliance with
L.R. 72.1. No objections have been raised in the al-
lotted time with respect to Judge Peebles' Report-
Recommendation. Furthermore, after examining the
record, the Court has determined that the Report-
Recommendation is not subject to attack for plain
error or manifest injustice.

  Accordingly, it is hereby

  **ORDERED,** that the Report-Recommendation
(Dkt. No. 30) is **APPROVED** and **ADOPTED** in
its **ENTIRETY;** and it is further

  **ORDERED,** that Defendants' Motion for sum-
mary judgment (Dkt. No. 28) be **GRANTED,** and
that Plaintiffs complaint in this action be **DIS-
MISSED** in all respects; and it is further

  **ORDERED,** that the Clerk serve a copy of this
Order on all parties.

  **IT IS SO ORDERED.**

  *REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate
Judge.

  Plaintiff Robert Crump, a prison inmate who is
proceeding *pro se* and *in forma pauperis,* has com-
menced this action pursuant to 42 U.S.C. § 1983
complaining of the deprivation of his civil rights
arising out of events that occurred while he was im-
prisoned, additionally asserting various pendent
state common law claims and asking that the court
exercise supplemental jurisdiction over those
causes of action. Plaintiff's complaint, which is
comprehensive, comprised of one hundred and fifty
six paragraphs and including thirty separate causes
of action, centers upon a series of events including
two separate, brief periods of disciplinary special
housing unit ("SHU") confinement and what he
characterizes as ongoing harassment on the part of
various corrections officers. Plaintiff's complaint
seeks recovery of compensatory and punitive dam-
ages totaling $86.4 million.

  Currently pending before the court is a motion
brought by the defendants for summary judgment
dismissing the plaintiff's complaint. In their motion,
defendants argue that plaintiff's claims should be
dismissed for a variety of reasons, including pro-
cedurally based upon plaintiff's failure to exhaust
his administrative remedies with respect to certain

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EX. 2

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

claims, and substantively because he has failed to state viable due process and retaliation claims, adding that his damage claims are barred by the Eleventh Amendment as well as New York Correction Law § 24 and the doctrine of qualified immunity. Having carefully considered the record now before the court, I recommend that defendants' motion, which plaintiff has not opposed, be granted, and that his complaint be dismissed in its entirety.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

**\*2** At the times relevant to the complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS") and was designated to Riverview Correctional Facility ("Riverview"), located in Ogdensburg, New York.[FN2] *See* Complaint (Dkt. No. 1) ¶ 33. Plaintiff's complaint arises out of two separate incidents that occurred while he was confined to Riverview, the first resulting in his confinement for three days in the facility SHU and the second leading to thirty days of keeplock confinement which, he claims, evolved in retaliation for his having filed a grievance complaining about the procedure for inmate assignments to messhall duty.[FN3,FN4]

> FN2. Plaintiff was released on parole on January 11, 2008. *See* Dkt. No. 5; *see also,* Reusner Aff. Exh. B (Dkt. No. 28-10).

> FN3. A Special Housing unit is defined by regulations promulgated by the DOCS as "single- or double-occupancy cells

grouped so as to provide separation from the general population [which] may be used to house inmates confined to such units pursuant to Part 301 ...." 7 N.Y.C.R.R. § 300.2(b). Inmates may be admitted to SHU for various reasons, not limited to disciplinary action. 7 N.Y.C.R.R. § 301.1 Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. They are allowed two showers per week and one hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

FN4. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at \*2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams, and counseling, and can have cell study, books, and periodicals, *Id.* The primary difference between keeplock and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

Page 3

the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.* Keeplock is a less severe penalty than SHU; for example keeplocked inmates have access to their personal property, while SHU inmates do not. *Grant v. Riley,* No. 89 CIV. 0359, 1996 WL 727441, at *1 n. 1 (S.D.N.Y. Dec.17, 1996). In addition, keeplocked inmates are afforded more liberal visitation rights. *Id.*

According to the plaintiff, the genesis of his difficulties was a handwritten grievance filed with the Riverview Inmate Grievance Resolution Committee ("IGRC") on February 13, 2006. Complaint (Dkt. No. 1) ¶ 20. Labeling his grievance as "Inmates In Messhall w/o Medical Screening", Crump complained that inmates were being assigned to messhall program jobs without adequate physical examination or testing for communicable diseases, and that there were one or more inmates with hepatitis C working in the messhal. *Id.* Exhs. B & C; *see also* Affirmation of Susan C. von Reusner ("Reusner Aff.") (Dkt. No. 28-8) Exh. C (Dkt.28-11) p. 3. The IGRC subsequently investigated Crump's grievance, which was stamped received on February 13, 2006 and assigned grievance number RV-8195-06, and prepared a report noting that all inmates are screened upon arrival at Riverview, there is no requirement that inmates assigned to the messhall undergo any medical testing, "[b]oth HIV and hepatitis C are blood born/body fluid carried diseases", and universal precautions are to be used by all who work in those areas. *Id.* at p. 5. Notwithstanding these observations, the IGRC agreed that every inmate assigned to the messhall program should be medically cleared at the time of assignment. *Id.* at p. 4; *see also* Complaint (Dkt. No. 1) Exh. A.

On February 28, 2006, upon review of the IGRC's recommendation, defendant Ekpe D. Ekpe, the superintendent at Riverview, denied Crump's grievance, finding that existing medical review procedures conducted upon an inmate's arrival at the facility and the sick-call process provide sufficient medical screening of inmates assigned to work in the messhall. Reusner Aff. Exh. C (Dkt. No. 28-11) p. 1. Plaintiff does not allege that he appealed the superintendent's determination, and it thus appears that he took no further action regarding this grievance.

Plaintiff maintains that on the morning of March 2, 2006, in retaliation for filing that grievance, Superintendent Ekpe and defendant Sergeant Reneiri appeared at the "F-1" Housing Unit, where plaintiff was then designated, called plaintiff to the officer's observatory station, and demanded that plaintiff follow them to the messhall and identify any inmate working there who was infected with HIV or hepatitis C. Complaint (Dkt. No. 1) ¶¶ 37-38. When plaintiff refused to comply and attempted to explain his grievance, the superintendent became angry, began yelling at plaintiff and berating him, and commanded that Sergeant Reneiri and Corrections Officer ("C.O.") Wilkens "get him out of here." *Id.* at ¶¶ 39-41.

*3 Plaintiff was taken to the facility SHU, where he was processed and strip searched, and confined for a period of seventy-two hours. Complaint (Dkt. No. 1) ¶¶ 42-47, 52; *see also* Declaration of Ekpe D. Ekpe ("Ekpe Decl.") (Dkt. No. 28-5) ¶ 8. Plaintiff asserts that while in the SHU he was interviewed by a facility supervisor, who told Crump that he had been sent to SHU "in order to make sure that he was not 'starting trouble in their jail' ". Complaint (Dkt. No. 1) ¶ 51. Defendants maintain that plaintiff's confinement to SHU was spawned by the superintendent's concern for safety and order at the facility pending an investigation of allegations that Crump was spreading rumors among the inmates that workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Ekpe Decl. (Dkt. No. 28-5) ¶ 8. Although

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

plaintiff asserts that his assignment to SHU was re-taliatory, he admittedly did not grieve his three-day SHU confinement. Declaration of Kristina Monnet ("Monnet Decl.") (Dkt.28-6) ¶ 8; *see also* Crump Deposition Transcript ("Crump Tr.") (Dkt. No. 28-24) pp. 13, 15, 24, 91-93.

When released from SHU confinement three days later, plaintiff collected the personal belong-ings that had been taken from him upon his transfer into the unit and discovered that a property invent-ory form, No. 1-64, had not been completed when they were confiscated. Complaint (Dkt. No. 1) ¶ 52. When he returned to the F-1 unit and the cubicle to which he had previously been assigned and un-packed his personal property, Crump found that many of his belongings were missing, damaged, or destroyed. *Id.* ¶¶ 52-54.

Following his release from SHU confinement, Crump claims to have suffered harassment and threats from unnamed corrections officers who were encouraging plaintiff to file a grievance or civil complaint against Superintendent Ekpe be-cause Ekpe "had no right to do what he did" to Crump. Crump Tr. (Dkt. No. 28-24) pp. 12-15, 18, 24; *see also* Complaint (Dkt. No. 1) ¶¶ 58-59. Ac-cording to plaintiff, the superintendent is the only "black African-American" at Riverview, and his subordinate corrections officers are trying to get him out of that facility so that they can control it. Crump Tr. (Dkt. No. 28-24) pp. 12-15. Because Crump was trying to maintain good behavior so that he would be released from the prison, he did not file a grievance or complaint against Ekpe. *Id.* As a result, plaintiff was subjected to continued harass-ment by corrections officers at the facility. *Id.*

On March 11, 2006 Crump was involved in an incident in which inmates were "horse playing" in the bathroom. Complaint (Dkt. No. 1) ¶¶ 60-63; *see also* Crump Tr. (Dkt. No. 28-24) pp. 23-24. Ac-cording to prison officials, while standing near the entrance to the bathroom plaintiff shouted out a warning to the inmates inside that a corrections of-ficer was approaching. Reusner Aff. Exh. G (Dkt.

No. 28-15). When defendant Sears, who responded to the incident, ordered Crump to produce his iden-tification, he became loud and belligerent, arguing that he had not done anything. *Id.* After he dis-obeyed several orders to return to his cube, C.O. Sears placed plaintiff on "full bed status" and com-pleted a misbehavior report citing Crump for three misconduct charges, including verbal interference, creating a disturbance, and disobeying a direct or-der. *Id.*

*4 A Tier II disciplinary hearing was conduc-ted by defendant Lieutenant McNally on March 15, 2006 to address the charges contained in the misbe-havior report.[FN5] *See* Reusner Aff. Ex. H (Dkt. No. 28-16). At the commencement of the hearing Crump was advised of and stated that he understood the charges against him, and he pleaded guilty to refusing a direct order, but denied having created a disturbance or having interfered with a corrections employee. *Id.* at pp. 1-2. During the hearing plaintiff testified and was permitted to call two in-mate witnesses, both of whom testified that Crump had been standing outside of the bathroom watch-ing television at the time of the horseplaying incid-ent but did not shout out that a corrections officer was coming. *See generally id.* At the close of the hearing, plaintiff stated that he had no procedural objections to the conduct of the hearing. *See* Re-usner Aff. Ex. H (Dkt. No. 28-16) at p. 7. Based upon the misbehavior report written by Corrections Officer Sears and his finding that the inmate wit-nesses lacked credibility, defendant McNally found the plaintiff guilty of all three charges and imposed a penalty of thirty days of keeplock confinement, with a concomitant loss of package, commissary and telephone privileges.[FN6] *Id.* Plaintiff appealed the disciplinary finding, and the superintendent af-firmed Lieutenant McNally's determination on March 27, 2006. Reusner Aff. Exh. J. (Dkt. No. 28-18).

> FN5. The DOCS conducts three types of inmate disciplinary hearings. Tier I hear-ings address the least serious infractions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

and can result in minor punishments, such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

FN6. The record is not entirely clear as to whether plaintiff was confined to SHU or keeplock for that thirty-day period. Plaintiff alleges in his complaint and testified at his deposition that he served the time in the facility SHU. Complaint (Dkt. No. 1) ¶ 66; *see also* Crump Tr. (Dkt. No. 28-24) pp. 25-26. The transcript of the disciplinary hearing, Dkt. No. 28-16, and disciplinary record, Dkt. No. 28-17, in contrast, reflect that plaintiff was confined to keeplock. In their statement of undisputed facts, filed in accordance with Local Rule 7.1(a)(3), submitted in support of their motion, defendants assert that plaintiff was sentenced to thirty days of keeplock confinement. Dkt. No. 28-2 at ¶ 28. Since it appears plaintiff was assigned to a cubicle while at Riverview, *see* Complaint (Dkt. No. 1) ¶ 53, rather than a cell, an arrangement which would more easily lend itself to a keeplock confinement, and drawing all inferences in plaintiff's favor, I have assumed that plaintiff served his thirty day keeplock confinement at the facility SHU.

While in keeplock, plaintiff sent a letter to Superintendent Epke, stamped received on March 22, 2006, complaining of unspecified threats and fear of reprisals from unidentified corrections officers. Reusner Aff. Ex. K. (Dkt. No. 28-19) Sergeant Willett, who is not a named defendant, was assigned to

investigate plaintiff's complaint to the superintendent. Complaint (Dkt. No. 1) ¶ 74. As part of his investigation, Sergeant Willett prepared a report of his interview of the plaintiff, dated April 5, 2006. Reusner Aff. Exh. L (Dkt. No. 28-20). In it, Sergeant Willet reported that Crump indicated he felt the need for "protection from the superintendent because the superintendent runs the place and all the correction officers are now head hunting him for every rule violation they can get." *Id.* Plaintiff denies making this statement, but claims that Willet changed plaintiff's story and insisted that Crump's complaints were not with the corrections officers, but with the superintendent for putting him in SHU confinement without reason. Complaint (Dkt. No. 1) ¶ 74. By memorandum dated April 19, 2006, Captain Kanaly advised plaintiff that his complaint of threats had been investigated, and it was determined that there was no threat to Crump's safety at Riverview. Reusner Aff. Exh. L (Dkt. No. 28-20) at p. 2 (unnumbered).

The following day plaintiff filed another grievance, this time identified by him as "Code 1-Forced Into Messhall." Reusner Aff. Exh. M (Dkt. No. 28-21). Plaintiff's grievance, designated as number RV-8291-06, complained of his mandatory assignment to messhall duty, unspecified harassment and threats, loss of personal property, and that he was "being targeted for tickets and being found guilty ... when another inmate has claimed in great respect and honesty that I Crump didn't do that charge but that he did it." *Id.* In response to that grievance Superintendent Ekpe 1) advised Crump to follow appropriate claims procedures with regard to alleged, missing items; 2) advised that it appeared there were no longer any disciplinary actions pending; 3) stated that effective May 8, 2006 plaintiff would be programed as a Phase II Program Aid and A-2 Porter; and 4) noted that a sergeant had been assigned to conduct an investigation regarding plaintiff's complaint, and that based upon the investigation it was determined that no further action was necessary and that plaintiff's complaints had been adequately addressed. Reusner Aff. Exh. N (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

28-22). On plaintiff's appeal to the DOCS Central Office Review Committee ("CORC"), by decision dated July 5, 2006 the CORC upheld the superintendent's determination, noting that Crump was then assigned as a program aide in the mornings and a porter in the evening, and also advising Crump that his disciplinary sanction could be appealed in accordance with the DOCS regulations as set forth in 7 N.Y.C.R.R. Part 5. *Id.* Exh. O (Dkt. No. 28-23).

II. *PROCEDURAL HISTORY*
   **\*5** Plaintiff commenced this action on December 21, 2007. Dkt. No. 1. Named as defendants in plaintiff's complaint are Epke D. Epke, the superintendent of Riverview; Deputy Superintendent Hessel; Lieutenant McNally; Sergeant Reneiri; three John Doe corrections officers; and Corrections Officer Sears. *Id.* While plaintiff's claims appear to center upon his first grievance and the retaliation that he allegedly suffered as a direct result of its filing, his complaint includes thirty separate causes of action including for violations of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, alleging claims of retaliation, deprivation of liberty and property without due process, and cruel and unusual punishment, all relating to his confinement to SHU and keeplock. Additionally, plaintiff alleges common law claims of negligence as well as violations of the New York Correction Law and the DOCS regulations.

   On April 3, 2009, following the completion of pretrial discovery in the case, defendants filed a motion for the entry of summary judgment dismissing plaintiff's claims as a matter of law. Dkt. No. 28. In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) he failed to exhaust his administrative remedies with respect to claims relating to his seventy-two hour confinement in SHU; 2) he has failed to state viable due process and retaliation claims; and 3) recovery is barred by the Eleventh Amendment as well as New York Correction Law § 24 and the

doctrine of qualified immunity.[FN7] Despite passage of the deadline for doing so, plaintiff has failed to submit papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN7. Defendants also correctly assert that the claims against the unnamed John Doe defendants must be dismissed as a result of plaintiff's failure to identify and timely serve these defendants. Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal where a summons and complaint is not served within 120 days after filing of the complaint, absent a showing of good cause. Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at \*1 (S.D.N.Y. Jan.11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F.Supp. 806, 809 (N.D.N.Y.1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel); *see also, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citation omitted) (court lacks jurisdiction until defendants properly served with summons and complaint). Inasmuch as plaintiff has failed to identify and take steps to obtain jurisdiction over the John Doe defendants, I recommend dismissal of his claims against them.

III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendants' Motion*

   Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

significance, if any, of his failure to oppose defend-
ants' summary judgment motion, and specifically
whether that failure automatically entitles defend-
ants to summary judgment dismissing plaintiff's
complaint.

This court's rules provide that

[w]here a properly filed motion is unopposed and
the Court determines that the moving party has
met its burden to demonstrate entitlement to the
relief requested therein, the non-moving party's
failure to file or serve any papers as this Rule re-
quires shall be deemed as consent to the granting
or denial of the motion, as the case may be, un-
less good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se*
plaintiffs are entitled to some measure of forbear-
ance when defending against summary judgment
motions. *See Jemzura v. Public Serv. Comm'n,* 961
F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.).
The deference owed to *pro se* litigants, however,
does not extend to relieving them of the con-
sequences of Local Rule 7.1(b)(3). *Robinson v.
Delgado,* No. 96-CV-169, 1998 WL 278264, at *2
(N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd,
M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997
WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997)
(Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980
F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. &
Hurd, M.J.). Accordingly, absent a showing of good
cause defendants' unopposed summary judgment
motion should be granted, if determined to be fa-
cially meritorious. *See Allen v. Comprehensive
Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32
(N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,*
103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn,
J.).

*6 It should also be noted that the plaintiff's
failure to properly oppose defendants' summary
judgment motion is not without further con-
sequences. By failing to submit papers in opposi-
tion to their motion, plaintiff has left the facts set
forth in defendants' Local Rule 7.1(a)(3) Statements

unchallenged, thus permitting the court to deem
facts set forth in the defendants' statement of mater-
ial facts not in dispute to have been admitted based
upon his failure to properly respond to that state-
ment.[FN8] *See Elgamil v. Syracuse Univ.,* No.
99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y.
Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see
also Monahan v. New York City Dep't of Corrs.,*
214 F.3d 275, 292 (2d Cir.2000) (discussing district
courts' discretion to adopt local rules like 7.1(a)
(3)).[FN9]

> FN8. Local Rule 7.1(a)(3) provides that
> *"[t]he Court shall deem admitted any facts
> set forth in the Statement of Material Facts
> that the opposing party does not specific-
> ally controvert."* See N.D.N.Y.L.R.
> 7.1(a)(3) (emphasis in original).

> FN9. Copies of all unreported decisions
> cited in this document have been appended
> for the convenience of the *pro se* plaintiff.

Based upon plaintiff failure to oppose defend-
ants' motion I recommend that the court review the
motion for facial sufficiency, accepting defendants'
assertions of facts as set forth in their Local Rule
7.1(a)(3) Statement as uncontroverted, and that the
motion be granted if determined to be facially mer-
itorious.

*B. Summary Judgment Standard*

Summary judgment motions are governed by
Rule 56 of the Federal Rules of Civil Procedure.
Under that provision, summary judgment is warran-
ted when "the pleadings, the discovery and disclos-
ure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter
of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v.
Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552,
91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10,
91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hart-
ford v. Old Dominion Freight Line, Inc.,* 391 F.3d
77, 82-83 (2d Cir.2004). A fact is "material", for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

*\*7* When deciding a summary judgment motion a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judg-

ment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Exhaustion of Remedies*

As a threshold, procedural basis for dismissal of his claims related to this incident, in their motion defendants contend that plaintiff's failure to file and pursue to completion, a grievance against Superintendent Ekpe, Sergeant Reneiri, and Deputy Hessel relating to his SHU confinement for seventy-two hours before filing suit, precludes him from asserting any claims arising out of that incident.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN10]

> FN10. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance protocol in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004)) (emphasis omitted).

*8 New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident.[FN11] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. 7 N.Y.C.R.R. § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision. 7 N.Y.C.R.R. § 701.5(d). Ordinarily, absent

the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> FN11. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

While plaintiff has alleged in his complaint that he filed a grievance in March of 2006 regarding his later keeplock confinement and that he has fully exhausted his administrative remedies with respect to the claims now raised, *see* Complaint (Dkt. No. 1) ¶¶ 19, 24, the record discloses that although clearly familiar with the IGP, he did not file any grievance related to his confinement in SHU, which began on March 2, 2006. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 28-2) ¶ 14. The record establishes that plaintiff filed only two grievances relevant to this action. The first, number RV-8195-06 and dated February 13, 2006, is the grievance complaining of the medical screening procedure for assigning inmates to messhall duty, a grievance which plaintiff claims spawned his three-day confinement to SHU. Reusner Aff. Exh. C (Dkt. No. 28-11). The second grievance, number RV-8291-06 and dated April 20, 2006, raises a variety of complaints but lacks any reference to the superintendent's order on March 2, 2006 that he be taken to the SHU for a seventy-two hour period to allow for investigation of the allegation that he was spreading dangerous rumors, the procedures which followed for escorting and admitting plaintiff into the SHU, or the conditions within the SHU during that seventy-two hour period. Reusner Aff. Exh. M (Dkt. No. 28-21). Indeed, during his deposition plaintiff admitted that he never made any complaint regarding this confinement, explaining that at the time he was trying to get out of Riverview. Crump Tr. (Dkt.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

No. 28-24) pp. 15, 93.

*9 Accordingly, while plaintiff's claims related to his later, Tier II disciplinary proceeding were properly exhausted, all those relating to and/or arising out of his three-day confinement to SHU are subject to dismissal for failure to exhaust available administrative remedies.[FN12]

> FN12. Twenty-one of plaintiff's thirty causes of action, including claims against Epke, Reneiri, Hessel and two John Does, relate to the March 2 through 5, 2006 SHU confinement. Additionally, in that section of the complaint identified by plaintiff as "legal claim" he alleges violation of the Fourth Amendment right to be free from illegal searches and seizures. Complaint (Dkt. No. 1) ¶ 149. The only allegations in the complaint relating to search and seizure are those asserting that when taken to SHU on March 2, 2006 plaintiff was subjected to a strip search and a visual body cavity search and that his personal property was taken at the time of his admission to SHU. See id. at ¶ 46. Accordingly, to the extent that this alleged constitutional violation relates to this search and/or confiscation of his personal property occurring at the time of his admission to SHU on March 2, 2006, it should be dismissed in light of plaintiff's failure to exhaust his administrative remedies with respect to that claim.

D. Retaliation

As was previously noted, in his complaint Crump alleges that his constitutional rights under the First Amendment were violated when, after he pursued his grievance regarding the medical screening procedures for assigning inmates to work in the messhall, he was subjected to harassment and threats, and disciplinary charges were lodged against him. Noting the ease with which such claims can be incanted by a prison inmate, defendants seek dismissal of this cause of action as legally deficient as a matter of law.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. See Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, sub. nom Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)); Davis v. Goord, 320 F.3d 346, 352 (2d Cir.2003).

In order to state a prima facie claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir.2007); Dawes, 239 F.3d at 492. If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." Mount Healthy, 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing a plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

*1. Confinement to SHU from March 2 Through 5, 2006*
**\*10** Plaintiff first asserts that Epke's order on March 2, 2006 to subject Crump to SHU confinement was motivated by the filing of his first grievance. The only factual allegation against Sergeant Reneiri in this regard is that following Epke's order, he handcuffed and escorted plaintiff to SHU.

It is well recognized that the filing of a grievance is protected conduct, and can thus satisfy the first prong of a retaliation claim. *Graham,* 89 F.3d at 80. Plaintiff has therefore sufficiently alleged that he engaged in constitutionally protected conduct. Additionally, after the filing of his grievance plaintiff was undeniably subjected to adverse action, in the form of confinement to SHU, and he has therefore also established the adverse action element of his retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004).

Plaintiff's claim fails, however, because he has failed to provide anything but conclusory allegations that the grievance was a substantial or motivating factor behind Epke's actions. To the contrary, Superintendent Epke explains that following his denial of plaintiff's grievance on February 28, 2006, there were allegations that plaintiff was spreading rumors among the other inmates that the workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Epke Decl. (Dkt. No. 28-5) ¶ 8. Legitimately concerned that if those reports proved

true plaintiff's unchecked rumors would disturb the prison environment by discouraging inmates from eating in the messhall, Superintendent Epke determined that is was necessary that plaintiff be removed from the general population while the allegations against him could be investigated. *Id.* Accordingly, plaintiff was held in SHU for only seventy-two hours and thereafter released to his previous housing unit and cubicle. Based upon these facts, no reasonable factfinder could conclude that plaintiff's grievance was the motivating factor for his placement in SHU.

With respect to plaintiff's claim against Sergeant Reneiri for his involvement, plaintiff has failed to allege any facts suggesting that he did anything but comply with a direct order issued by the superintendent which, even plaintiff acknowledged, defendant Reneiri was required to do. Crump. Tr. (Dkt. No. 28-25) p. 64. Accordingly, there is nothing but a conclusory allegation that Sergeant Reneiri acted in retaliation, to support plaintiff's retaliation claim against him, and no basis exists for a finding that his actions were taken for any other reason than a direct order from his superintendent.

As noted by defendants, the Second Circuit "ha[s] established a 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d at 657 (quoting *Rivera v. Senkowski,* 62 F.3d 80,86 (2d Cir.1995)). Accordingly, even if plaintiff had established that the filing of his first grievance was a motivating factor in the superintendent's decision to send him to SHU, the court further finds the defendants have established that in light of plaintiff's alleged dissemination of rumors, the same action would have been taken regardless of the filing of that grievance in order to allow for an investigation and maintain order in the facility. For these reasons, I conclude that defendants are entitled to summary judgment on this portion of plaintiff's retaliation claims.

*2. False Misbehavior Report*
**\*11** Plaintiff's retaliation claims against C.O.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

Sears and Lieutenant McNally are premised upon issuance of the March 11, 2006 misbehavior report and the subsequent disciplinary hearing. As defendants point out, plaintiff's theory in this regard is inconsistent, if not contradictory. Plaintiff appears to allege that defendant Sears' actions were in retaliation for *not* filing a grievance or civil complaint against the superintendent for sending Crump to the SHU. *See* Complaint (Dkt. No. 1) ¶¶ 59-64, 141; *see also* Crump Tr. (Dkt. No. 28-24) pp. 102-104. With regard to defendant McNally, plaintiff alleges in his complaint that he imposed disciplinary sanctions based upon Sears' false misbehavior report, in retaliation for Crump's filing of the first grievance ( *see id.* at ¶ 145), but later testified at his deposition that "Lieutenant McNally and Sears are the ones that retaliated against me for not filing the grievance, a complaint [against Epke]" (Crump Tr. (Dkt. No. 28-24) p. 104). Putting aside these contradictions, and assuming without deciding that plaintiff has alleged that he engaged in constitutionally protected conduct giving rise the alleged retaliation by defendants Sears and McNally, his claims are subject to dismissal because he has failed to allege, let alone adduce, any facts supporting an inference of a retaliatory motive.

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between the protected activity alleged in his complaint and the subsequent misbehavior report is the inference that might be drawn by the timing of his first grievance filed on February 13, 2006 and the misbehavior report issued in March 11, 2006. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report, can sometimes suffice to defeat a summary judgment motion seeking dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 14). In many circumstances, however, this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999)); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

**\*12** In this instance, temporal proximity is the only fact that might give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Although Crump denies shouting a warning to the inmates "horseplaying" in the bathroom, he admits being in the area of the bathroom door, that he did not immediately produce his identification when requested by C.O. Sears, and that he protested when ordered to do so, denying any wrongdoing. Indeed, the disciplinary hearing conducted by Lieutenant McNally plaintiff pleaded guilty to one of the three charges against him, again admitting his presence in the vicinity of the disturbance, and that he did not immediately comply with defendant Sears' order but tried to provide an explanation. Defendant McNally stated that his determination of guilt was based on the report issued by defendant Sears and his finding that plaintiff's inmate witnesses lacked credibility, and it was made in the context of plaintiff's admissions. Plaintiff does not allege any facts, and there is no evidence in the record, that either C.O. Sears or Lieutenant McNally was even aware of his messhall medical procedures grievance, let alone motivated by that grievance to take adverse action against the plaintiff. Additionally,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

plaintiff has provided no evidence regarding his prior disciplinary history. Given the totality of these circumstances, no reasonable factfinder could conclude that the misbehavior report and resulting findings of guilt after the Tier II disciplinary hearing were prompted by retaliatory animus. I therefore recommend dismissal of this remaining portion of plaintiff's retaliation claim.

E. *Harassment*

Though not specifically addressed by defendants in their motion, plaintiff's complaint also generally asserts that he was harassed by defendants; no specific factual allegations are provided, and plaintiff's complaint, though including a great deal of detail on other matters, is vague as to the identity of those corrections workers who are alleged to have participated in such harassment. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 58-59. According to plaintiff the harassment consisted of being pulled aside to isolated areas and prodded by corrections officers to file a civil complaint against superintendent Epke, targeted for random searches, assigned to the messhall (an apparently less desirable position than he had as a program aide), and called out by corrections officers by name. Crump Tr. (Dkt. No. 28-24) pp. 14, 32, 34, 51 and 73. Liberally construed, plaintiff's allegations of harassment are, at best, an attempt to state a violation of his Eighth Amendment right to be free from cruel and unusual punishment. His complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection.

42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996) (citations omitted). Thus, mere allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3

(N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. & DiBianco, M.J.) ("[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

*13 There are no allegations that plaintiff suffered from the infliction of any physical injury or pain as a result of defendants' harassing conduct. Plaintiff testified at his deposition that no physical force was used against him. Crump Tr. (Dkt. No. 28-25) at p. 42-43. When asked to identify physical injuries sustained as a result of the alleged harassment by prison workers, plaintiff testified at his deposition that he was "freezing for two days [in SHU], starving, they put me in a cold cell so you get proportional rationale meals." *Id.* at p. 105. The record is clear that plaintiff does not claim to have suffered any physical injury as a result of the alleged harassment. Plaintiff has therefore failed to meet the threshold requirement for an Eighth Amendment violation of showing the "unnecessary and wanton infliction of pain" by prison officials. *Whitley v. Albers,* 475 U.S. 312, 319, 196 S.Ct. 1078, 1084, 89 L.Ed.2d 251, ---- (1986). Consequently, I find plaintiff has failed to establish any facts that would support an Eighth Amendment violation.

F. *Due Process*

Another component of plaintiff's complaint focuses upon his contention that his right to procedural due process was abridged in connection with his three-day SHU confinement and his later disciplinary hearing. In their motion, defendants assert that plaintiff's claim fails at the outset, in light of his inability to prove the deprivation of a protected liberty interest.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

*1. Liberty Interest*

Addressing first plaintiff's seventy-two hour confinement in SHU, restrictive confinement for administrative reasons generally does not implicate a constitutionally protected liberty interest. *Jones v. Artuz,* No. 93 Civ. 8784, 1994 WL 721362, at *2 (S.D.N.Y.1994) (citing *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990)). Notwithstanding this general rule, a state may by regulation create a constitutionally protected liberty interest if the language employed is unmistakably mandatory. *McMillan v. Scully,* No. 85 Civ. 7280, 1986 WL 7543, at *3 (S.D.N.Y. June 30, 1986) (citing *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675(1972), *overruled in part by, Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418) (1985)).

Here, the record reveals plaintiff was confined to SHU for seventy-two hours for administrative reasons in order to maintain order in the facility while the allegation that he was spreading rumors was investigated.[FN13] Under the applicable DOCS regulations when an inmate is assigned involuntarily to SHU for administrative reasons, a hearing must be conducted within fourteen days of the inmate's admission. 7 N.Y.C.R.R. § 301.4(a). Plaintiff was released from SHU in considerably less than fourteen days, before the expiration of the period within which a hearing to determine the propriety of the segregation was even required. Under these circumstances, the controlling regulation does create a protected liberty interest, and his seventy-two hour confinement cannot support a procedural due process claim. *See Malik v. Miller,* 679 F.Supp. 268, 269 (W.D.N.Y.1988) (summary judgment

granted dismissing procedural due process claim arising out of administrative confinement for five days pending a disciplinary hearing).

> FN13. "Administrative segregation admission results from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b).

**\*14** Turning to the plaintiff's disciplinary confinement in keeplock, the Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey,* 197 F.3d at 583 (quoting *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293, 132 L.Ed.2d 418). Atypicality in a *Sandin* inquiry is normally a question of law.[FN14] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997); *see also Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y.2000) (citations omitted) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

> FN14. In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon,* 215 F.3d at 230-31; *Sealey,* 197 F.3d at 585.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*.[FN15] *Colon*, 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure).[FN16]

> FN15. Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485-86, 115 S.Ct. at 2301. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

> FN16. In fact, in *Colon* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Plaintiff's thirty-day keeplock confinement, without more, is patently insufficient to state a protectable liberty interest. *Rodriguez v. McGinnis*, 1 F.Supp.2d 244, 248 (S.D.N.Y.1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock ... confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin.* ") (quoting *Williams v. Keane*, No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997)).[FN17] Accordingly, the court finds that dismissal on this basis alone is appropriate.

> FN17. To the extent that plaintiff alleges a liberty interest in his assignment as a program aide relative to his apparent objection to having been temporarily assigned to the messhall after his disciplinary confinement, his claim must fail. It is well recognized that inmates do not have a protected interest to participate in prison programs. *Thompson v. LaClair*, No. 9:08-CV-37, 2008 WL 191212 at *4 (N.D.N.Y. Jan.22, 2008) (Scullin, S.J.) (citing *Boothe v. Hammock*, 605 F.2d 661, 664 (2d Cir.1979)).

*2. Procedural Protections*

Even assuming that plaintiff were able to prove the deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless fail because, based on the record now before the court, it is clear he was afforded ample due process. The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are both modest and well-established, the contours of the required protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff*, the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-70, 94 S.Ct. at 2978-83. In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence".[FN18] *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

> FN18. The "some evidence" standard under *Hill* has been described as considerably

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

tolerant. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). To be sure, the Fourteenth Amendment requires that at least some "reliable evidence" be contained in the record supporting the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (*quoting, inter alia, Luna v. Pico,* 356 F.3d 356, 488 (2d Cir.2004)). Based upon the court's review of the hearing transcript, and in particular plaintiff's testimony during the hearing, I conclude that no reasonable factfinder could determine that the hearing officer's conclusion was not based upon "some evidence".

*15 The record establishes that plaintiff received a copy of the misbehavior report setting forth the charges against him in advance of the hearing. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 1. A disciplinary hearing was conducted, and was recorded. *See generally id.* At the commencement of the hearing the plaintiff confirmed that he was aware of and understood the charges against him. Plaintiff was permitted to give an oral statement, as well as to offer testimony from his own witnesses. *See generally id.* At the close of the hearing, when asked if he had any objections to the procedure followed, plaintiff responded that he did not. *Id.* at 7. In addition, after announcing his disposition the hearing officer advised plaintiff of his right of appeal. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 8. Plaintiff later sought review by the superintendent, and the hearing officer's determination was upheld on appeal. Reusner Aff. Exh. J (Dkt. No. 28-18). The hearing officer's finding of guilt on two of the charges was based upon admissions made by plaintiff during the hearing as well as the misbehavior report. As to the third charge, plaintiff pleaded guilty. The hearing officer's determination was therefore supported by some evidence, thereby meeting the minimum requirements of the Fourteenth Amendment. The procedures that were provided to plaintiff thus were adequate to afford plaintiff the minimal process to which he was entitled.

Plaintiff also asserts that when presiding over his Tier II disciplinary proceeding, Lieutenant McNally was not impartial. To be sure, bias on the part of a disciplinary hearing officer can support a claim of procedural due process deprivation under the Fourteenth Amendment. *Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at *8 (S.D.N.Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983)). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009).

Plaintiff has alleged no facts that would lead a reasonable factfinder to conclude that Lieutenant McNally was biased in conducting the hearing. There is no allegation of any special relationship between C.O. Sears, the author of the misbehavior report, and McNally, and, as previously noted, there is no evidence that defendant McNally was even aware of plaintiff's initial grievance. To the contrary, for the reasons explained above, the undisputed evidence shows that Lieutenant McNally fairly conducted the hearing, and that plaintiff was provided more than sufficient due process with respect the disciplinary proceeding.

To the extent that plaintiff's claim of McNally's bias implicates an insufficient basis for his finding, I have already concluded that the evidence of plaintiff's guilt more than meets the some evidence standard. "[A] plaintiff armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment." *Francis v. Coughlin,* 891 F.2d 43, 37 (2d Cir.1989). Accordingly, plaintiff's bare allegations, without evidentiary support, are insufficient to establish a claim of hearing officer bias sufficient to withstand defendants' motion for summary judgment.[FN19] *Id.*

> FN19. In his complaint, plaintiff generally alleges in the section entitled "legal claim" that he seeks redress for violation of his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

Sixth Amendment rights, among other things. That constitutional amendment provides the right to a fair trial in all criminal prosecutions. *See* U.S. CONST. AMEND. VII. Presumably, plaintiff asserts the Sixth Amendment in relation to his disciplinary hearing. However, "prison disciplinary hearings are not treated as 'criminal' for the purposes of the Sixth Amendment." *Sash v. Zenk,* 439 F.3d 61, 63 (2d Cir.), *cert. denied,* 549 U.S. 920, 127 S.Ct. 277, 166 L.Ed.2d 212, S.Ct. 277 (2006); *see also Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981-82. As a result, plaintiff's Sixth Amendment claim should be dismissed.

**\*16** In light of the lack of evidence in the record demonstrating that plaintiff's procedural due process rights were violated during the course of his disciplinary hearing, I recommend dismissal of these claims.[FN20]

> FN20. Any procedural due process claim premised upon the claimed loss of his personal property while in SHU is also subject to dismissal. The alleged destruction or loss of plaintiff's personal property will not support a claim redressable under § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Second Circuit has held New York's post-deprivations remedies adequate to preclude a prisoner's due process claim for lost personal property. *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983).

G. *Claims Against Deputy Superintendent Hessel*
Although not specifically addressed by defendants, there is a separate and independent basis for dismissal of plaintiff's claims against Deputy Superintendent Hessel. The only allegations in the complaint against Hessel are found in plaintiff's twenty-fifth cause of action, alleging deprivation of liberty without due process of law in relation to

plaintiff's seventy-two hour confinement in SHU. Complaint (Dkt. No. 1) ¶ 137. The complaint otherwise lacks factual allegations detailing Hessel's involvement in this occurrence, and it therefore appears that the claim is premised solely upon Hessel's role as deputy superintendent.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").

Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices oc-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

curred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 2931(2009); *see also, Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

***17** During his deposition plaintiff clarified that he seeks to hold defendant Hessel liable for his confinement in SHU because "he's the deputy of the jail [,and] he has full knowledge ...." Crump. Tr. (Dkt. No. 28-24) p. 45; *see also, id.* at pp. 100-101. Plaintiff acknowledges that Hessel never spoke to him, and did not order that he be placed in the SHU. Crump. Tr. (Dkt. No. 28-24) p. 101. "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson,* 347 F.3d at 435 (citations omitted). Accordingly, plaintiff's claims against Deputy Superintendent Hessel should be dismissed. *see, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same).

## H. *Violation of State Law*
In addition to setting forth constitutional claims, plaintiff's complaint asserts that his SHU confinement violated New York Correction Law §§ 112, 137(5) and 138(4) and various regulations of the DOCS.[FN21] To the extent that plaintiff attempts to state a claim under 42 U.S.C. § 1983 for the alleged violation of these provisions, such a claim fails as a matter of law.

> FN21. New York Correction Law § 112 generally relates to the duties of the commissioner of the DOCS relating to correctional facilities. *See* N.Y. Correct. Law § 112. In general, section 137(5) prohibits degrading treatment of inmates. *See id.* at §

137(5). Section 138(4) provides that "[i]nmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." *See id.* at § 138(4). Plaintiff also generally alleges violation of 7 N.Y.C.R.R. "Sections 250-300 et. seg." Complaint (Dkt. No. 1) ¶ 98.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson,* 01-CV-1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.) (internal quotation marks and citation omitted). This is so because the DOCS directives merely provide a system which the DOCS Commissioner has established to assist him or her in exercising discretion, which he or she retains despite any violation of those directives. *Id.*

Plaintiff's claims relating to state laws and regulations should, therefore, be dismissed.

## J. *Immunity*
Lastly, in support of their motion defendants assert that plaintiff's claims against them are barred by the immunity provided under the Eleventh Amendment as well as the doctrine of qualified immunity, and that his state law claims are precluded by New York Correction Law § 24.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 19

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

### 1. *Eleventh Amendment*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN22] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), *aff'd* 767 F.2d 998 (2d Cir.1985) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN23] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

> FN22. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. In *Northern Ins. Co. of New York v. Chatham County* the Supreme Court reaffirmed that the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. 547 U.S. 189,193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367,---- (2006).

> FN23. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

**\*18** It is unclear whether plaintiffs' claims are alleged against defendants in their individual or official capacities, or both. To the extent that plaintiff asserts his claims against defendants in their official capacities, plaintiff's damage claims are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects. As a result, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and plaintiff's damage claim against the defendants in their capacities as state officials be dismissed

### 2. *New York Correction Law § 24*

By statute, New York invests state employees, including correctional workers, with immunity from suits requiring them to personally answer state law claims for damages based on activities falling within the scope of the statute, providing that

> 1. [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco,* 119 F.3d 183, 186-87 (2d Cir.1997).[FN24] Section 24 thus precludes claims against corrections officers brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996). In *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), the Su-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

preme Court recently held this provision unconstitutional to the extent it precludes inmates from pursuing § 1983 actions. In the wake of *Haywood*, one court in this district has observed that "[a] claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *May v. Donneli,* 9:06-cv-437, 2009 WL 3049613, at * 5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. & Treece, M.J.). In that case, because the acts of the corrections officers, which were alleged to have violated New York Correction Law § 610, clearly fell within the scope of their employment, the court found that it lacked jurisdiction to hear such pendent state law claims. *See id.*

> FN24. To be sure, the immunity afforded under section 24 is by no means absolute; actions taken by corrections workers occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that section. The circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment made by a special education teacher employed by the DOCS against a corrections officer assigned to the same facility, serves aptly to illustrate the type of situation in which section 24 would not afford protection. *Ierardi,* 119 F.3d at 188-89.

In this case plaintiff's pendent state law claims, alleging violations of the New York Correction Law and the DOCS regulations, as well as common law negligence, indisputably arise from actions taken by the defendants in their roles as corrections employees, including the determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged. While they may allege constitutional deprivations and actions exceeding the scope of a corrections officer's authority, these

types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against corrections officers in their individual capacities, whether in state or federal court. *See, e.g. Baker,* 77 F.3d at 15-16; *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb.17, 1994) (McCurn, S.J.). *Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dep't 1987) (holding Correction Law section 24 applicable to actions against corrections officers for allegedly using excessive force when returning inmates to their cells during a disturbance), *lv. denied,* 70 N.Y.2d 602, 518 N.Y.S.2d 1024, 512 N.E.2d 550 (1987). For this reason, I find that plaintiff's state law claims are precluded by section 24, and recommend that they be dismissed.[FN25, FN26]

> FN25. In any event, even if I were to conclude that those state law claims were not precluded, I would recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction are dismissed." *Stephenson v. Albany County Policymakers,* Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug.14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

> FN26. In light of the foregoing, I have declined to address defendants' assertion of qualified immunity as further grounds for dismissal of the complaint.

*IV. SUMMARY AND RECOMMENDATION*
   **\*19** At the heart of plaintiff's complaint is the claim that he was retaliated against for filing a grievance complaining that inmates assigned to work in the messhall did not receive adequate advance medical screening. Out of this arises thirty causes of action alleging violations of various constitutional provisions as well as New York State

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

Correction Law, the DOCS regulations and com-
mon law tort claims. Having failed to exhaust his
administrative remedies regarding his seventy-two
hour SHU confinement, I recommend that all of
plaintiff's claims relating to that event be dismissed
on this procedural basis. With respect to his claims
of retaliation and those relating to alleged viola-
tions of his right to due process, I have concluded
that no reasonable factfinder could determine that
plaintiff's constitutional rights were violated and
therefore recommend dismissal of these claims on
the merits. Additionally, plaintiff has not alleged
personal involvement on the part of defendant Hes-
sel, thus failing to provide a basis for a finding of
liability against him. To the extent that Crump has
named defendants in their official capacities, I re-
commend dismissal based upon the sovereign im-
munity afforded by the Eleventh Amendment. Fi-
nally, because violations of state law and regula-
tions do not state a claim under section 1983, and in
any event, plaintiff's claims are precluded by New
York Correction Law § 24, I recommend dismissal
of all of plaintiff's claims that are premised upon vi-
olation of state law. Accordingly, it is hereby re-
spectfully

RECOMMENDED that defendants' motion for
summary judgment (Dkt. No. 28) be GRANTED,
and that plaintiff's complaint in this action be DIS-
MISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1),
the parties may lodge written objections to the fore-
going report. Such objections shall be filed with the
Clerk of the Court within FOURTEEN days of ser-
vice of this report. FAILURE TO SO OBJECT TO
THIS REPORT WILL PRECLUDE APPELLATE
REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P.
6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d
Cir.1993).

It is hereby ORDERED that the clerk of the
court serve a copy of this Report and Recommenda-
tion upon the parties in accordance with this court's
local rules.

N.D.N.Y.,2010.
Crump v. Ekpe
Not Reported in F.Supp.2d, 2010 WL 502762
(N.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.