**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AUREL SMITH,

                                Plaintiff,

           v.                                                No. 11-CV-20
                                                          (MAD/CFH)

KENNETH PERLMAN, Deputy Commissioner
of Programs, NYS Department of Correctional
Services; MARK LEONARD, Director of
Ministerial Services, NYS Department of
Correctional Services; DANIEL MARTUSCELLO,
Superintendent of Coxsackie Correctional
Facility; CAPTAIN R. SHANLEY, Captain, Acting
Deputy Superintendent of Security at Coxsackie
Correctional Facility; JEFFREY A. HALE; HARRY
S. GRAHAM, Superintendent of Auburn
Correctional Facility; and G. ROBINSON, Deputy
Superintendent of Auburn Correctional Facility,

                                Defendants.

_____

**APPEARANCES:**                      **OF COUNSEL:**

AUREL SMITH
02-A-6279
Plaintiff Pro se
Attica Correctional Facility
Box 149
Attica, NY 14011


HON. ERIC T. SCHNEIDERMAN      KEVIN M. HAYDEN, ESQ.
Attorney General for the                Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341


**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff pro se Aurel Smith ("Smith"), an inmate currently in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven DOCCS employees, violated his constitutional rights under the First and Fourteenth Amendments as well as rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1 et seq. Second Am. Compl. (Dkt. No. 47). Presently pending is Smith's motion for partial summary judgment (Dkt. No. 73) and defendants' cross motion for summary judgment, both pursuant to Fed. R. Civ. P. 56. Dkt. No. 81. Smith does not oppose defendants' cross motion.[2] Smith also filed a motion for a temporary restraining order and preliminary injunction. Dkt. No. 79. For the following reasons, it is recommended that Smith's motion for partial summary judgment be denied, defendants' cross motion be granted, and Smith's motion for a temporary restraining order and preliminary injunction be denied.

## I. Background

The specific facts of the case are set forth in the Report-Recommendation and Order filed February 28, 2012, familiarity with which is assumed. See Dkt. No. 33 (Report-Recommendation); Dkt. No. 38 (Memorandum-Decision and Order).

---

[1] This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] Upon requests, this Court twice granted Smith an extension of time to respond to defendants' cross motion, the most recent deadline being February 5, 2014. Dkt. Nos. 84, 86. The deadline expired and Smith never responded.

## A. Procedural History

Smith is a practicing Muslim who claims that at the Coxsackie Correctional Facility ("Coxsackie"), his: (1) First Amendment and RLUIPA rights were violated when defendants Martuscello and Shanley prohibited him from attending three religious Friday services while keeplocked,[3] defendants Saltsman and Adams prohibited him from attending a Saturday religious study group, and defendants Perlman and Leonard changed DOCCS's policy to allow only one family guest event per year; and (2) Fourteenth Amendment rights were violated because defendants Martuscello and Shanley prohibited him from attending religious Friday services while keeplocked and defendants Perlman and Leonard treated Muslims differently than Native Americans concerning the number of family participation events they were allowed annually. Dkt. No. 33 at 2, 10.

Defendants filed a motion to dismiss. Dkt. No. 24. Subsequently, the Court dismissed Smith's: (1) equal protection claims against defendants Martuscello and Shanley; (2) First Amendment and RLUIPA claims against defendants Saltsman and Adams; and (3) state law claims against Martuscello, Saltsman, and Adams. Dkt. No. 38 at 23.

On September 25, 2012, this Court granted Smith's motion to supplement his complaint. Dkt. No. 46. Smith's supplemental complaint, together with his first amended complaint and attached exhibits, became Smith's second amended complaint and operative pleading. Dkt. Nos. 46–47.

---

[3] "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

## B. Additional Claims

All additional claims alleged in Smith's second amended complaint occurred at Auburn Correctional Facility ("Auburn"), where Smith was transferred to in March 2011. Suppl. Compl. (Dkt. No. 47-4 at 1–13) at 3.

### i. Dietary Restrictions

As a Muslim, Smith is required to maintain a halal diet through the Religious Alternative Menu ("RAM"), which at times, consists of soy-based proteins. Suppl. Compl. at 3–4, 9. Additionally, during his incarceration in 1999, Smith began having digestive problems and limited his soy intake to resolve those problems. Smith Dep. (Dkt. No. 81-3) at 44:20–46:9. Since 2008, Smith has been medically prescribed a therapeutic diet, which includes non-halal proteins, for treating his digestive issues. Suppl. Compl. at 4; Smith Dep. at 52:18–53:1. Smith tries to consume RAM meals but if it contains soy-based proteins, he reverts to non-halal proteins that are available to the general prison population. Dkt. No. 73-1 ¶ 59. Smith testified that he trades with other inmates for halal items. Smith Dep. at 61:1–20, 62:9–15. Smith sought a meal accommodation in which the therapeutic diet incorporates halal meats. Suppl. Compl. at 9.

Smith contends that Muslim inmates are treated differently from Jewish inmates because Jewish inmates who require a therapeutic diet are provided kosher protein sources. Suppl. Compl. at 10. Smith believes that the kosher meals are of a better quality than the RAM meals. Dkt. No. 73-1 ¶ 91.

On April 28, 2011, Smith filed a grievance requesting religious dietary

4

accommodations.[4]  Suppl. Compl. at 10–11; Dkt. No. 47-4 at 23–40.  The Inmate Grievance Resolution Committee ("IGRC") referred Smith's grievance to defendant Graham, the Auburn Superintendent.  Suppl. Compl. at 5; Dkt. No. 47-4 at 31.  Graham determined that Smith must "choose to receive either a religious diet or a therapeutic diet, as combinations of the two diets are not offered."  Suppl. Compl. at 5–6; Dkt. No. 47-4 at 32.  Smith appealed the Superintendent's decision to the Central Office Review Committee ("CORC").  Suppl. Compl. at 6.  On August 31, 2011, CORC denied Smith's appeal, affirming Graham's decision, and stating that "the religious alternative diet is appropriate for Muslim inmates."  Suppl. Compl. at 6; Dkt. No. 47-4 at 33.

### ii.  Religious Friday Services

On May 9, 2011, Smith was not advised of a change to his job schedule.  Suppl. Compl. at 6.  As a result, Smith missed work, was issued a misbehavior report, and placed in keeplock pending a disciplinary hearing.  Id. at 6–7; Smith Dep. at 34:10–35:1.  While confined, Smith filed a special form requesting attendance at religious Friday services.  Suppl. Compl. at 7; Smith Dep. at 29:12–30:23; Dkt. No. 47-4 at 14.  Defendant Robinson, the deputy superintendent of security, denied this request on May 11, 2011 because of Smith's disciplinary record during the six months prior to being keeplocked.  Suppl. Compl. at 7; Dkt. No. 47-4 at 14.  However, Smith denies having any prison infractions during that

---

[4]  The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to:  (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] . . . within four working days of receipt of the superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004) (internal citations omitted).

time period.  Suppl. Compl. at 7.

On May 15, 2011, Smith was adjudged guilty after a disciplinary hearing and given fifteen days of keeplock.  Suppl. Compl. at 7.  Smith again filed a request to attend religious services.  Id.; Dkt. No. 47-4 at 15.  Robinson denied that request on May 17, 2011 without an explanation.  Suppl. Compl. at 7; Dkt. No. 47-4 at 15.  Smith then filed a grievance, "asserting an infringement of his religious . . . rights."  Suppl. Compl. at 7; Dkt. No. 47-4 at 16–19.  On June 2, 2011, the IGRC responded "the reason for the denial was due to [Smith] being found guilty of Tier 2 tickets on 5/9/10 as well as [on] 10/12/10."  Suppl. Compl. at 8; Dkt. No. 47-4 at 20.  Smith appealed this denial to Graham, who denied it for the same reasons.  Suppl. Compl. at 8; Dkt. No. 47-4 at 21.  Smith appealed to CORC, which upheld the decision and determined that Smith "presented a legitimate threat to the safety and security at the facility . . . attendance at religious services on keeplock status [is] not an entitlement."  Suppl. Compl. at 8; Dkt. No. 47-4 at 22.  Smith completed his keeplock confinement on May 24, 2011.  Suppl. Compl. at 8.

### C.  Defendants' Contentions

#### i.  Dietary Restrictions

Non-party Culkin is the Assistant Director of DOCCS's Office of Nutritional Services and a registered dietitian.  Culkin Aff. (Dkt. No. 81-34) ¶ 1.  Culkin attested that DOCCS provides meals to 54,700 inmates with a standardized state-wide menu that considers factors such as the palatability of food, nutritional quality, accommodation of religious requirements, therapeutic needs, security implications, and cost containment.  Id. ¶¶ 4–5.

By November 1996, RAM was available virtually at all DOCCS facilities to anyone

regardless of religious affiliation.  Culkin Aff. ¶¶ 6–7.  RAM is served at the same time as the regular menu and accommodates many inmates in an economically viable way.  Id. ¶ 8.  To accommodate non-pork eaters, pork is served only once a month.  Id. ¶ 9.  RAM only provides a halal chicken patty once per week and other alternative entrées are non-halal.  Id. ¶¶ 10–11; Dkt. No. 81-35 (sample weekly menus).  Halal proteins are served on Islamic holy days and DOCCS provides Muslims with halal meat approximately sixty-nine times a year.  Culkin Aff. ¶¶ 12–13.  Inmates can also receive halal proteins via care package or commissary.  Id. ¶ 14.  If the commissary does not carry halal proteins, an inmate can petition the Inmate Liaison Committee to have products obtained for sale.  Id.

The Cold Alternative Diet ("CAD") is DOCCS's kosher diet, which are more expensive single-serve packages.  Culkin Aff. ¶ 16.  Muslim inmates can consume CAD but Jewish inmates cannot eat RAM, and since CAD is expensive, participation in CAD is limited.  Id. ¶ 17.  Further, religious menus must be strictly followed and are not offered in combination with therapeutic diets.  Id. ¶ 20; Dkt. No. 81-36 at 7; see also Dkt. No. 47-4 at 33 (CORC decision stating religious menus are strictly followed to maintain religious integrity).

Smith is on the "Controlled A" therapeutic menu.  Culkin Aff. ¶ 21; Dkt. No. 81-37 (sample modified menus).  Controlled A is high fiber and lower fat, cholesterol, and sodium.  Culkin Aff. ¶ 22.  Controlled A does not have the halal chicken patty because it is high in sodium, which would defeat the Controlled A's purpose.  Id. ¶ 23.  A non-halal chicken patty costs $0.43 versus $0.78 for a halal chicken patty and if the halal chicken patty is added to the Controlled A menu once per week, the estimated cost would be an additional $52,598 annually.  Id. ¶ 24.

### ii. Religious Services at Coxsackie

Defendant Martuscello, Coxsackie's superintendent, was responsible for facility supervision and management. Martuscello Aff. (Dkt. No. 81-28) ¶ 3. In August 2009, Martuscello delegated to defendant Shanley, Coxsackie's acting deputy superintendent of security, the duty of reviewing keeplock inmates' requests to attend religious services. Id. ¶ 5. Martuscello maintains there was no policy of denying all keeplocked inmates' requests to attend religious services. Id. ¶ 8.

Shanley attested that Smith was denied attendance at religious services because of his disciplinary history. Shanley Aff. (Dkt. No. 81-22) ¶ 6. Specifically, Smith received a misbehavior report on September 14, 2007 for creating a disturbance while being escorted to a religious Friday service. Id. ¶¶ 7–8; Dkt. Nos. 81-23, 81-24 at 2. Smith received another misbehavior report on August 1, 2009 for refusing direct orders and physical interference. Shanley Aff. ¶ 9; Dkt. No. 81-25. The next day, Smith received a misbehavior report for making threats of violence toward correction officers, urging inmates to participate in detrimental actions, and creating a disturbance. Shanley Aff. ¶ 10; Dkt. No. 81-26. Those misbehavior reports resulted in Smith's placement in keeplock from August 2, 2009 through September 1, 2009. Shanley Aff. ¶ 11; Dkt. No. 81-24 at 2.

While inmates in keeplock are generally not permitted to attend religious services outside of their cells, they are permitted to worship on their own and provided materials to observe their faith. Shanley Aff. ¶ 13. Shanley was tasked with deciding whether to grant requests for religious service attendance based on several considerations such as the reason for the inmate's keeplock confinement, severity or frequency of the conduct that resulted in keeplock, inmate's past violent or disruptive behavior while incarcerated, and

8

security risk involved with requested activity.  Id. ¶ 16.  Shanley maintains that each request was handled on a case-by-case basis.  Id. ¶ 17.  Shanley attested he denied Smith's request in August 2009 due to Smith's disciplinary history and violent and disruptive behavior.  Id. ¶¶ 18–20.

Defendants Perlman and Leonard attested that the policy change for family guest events was implemented with respect to all recognized religions except for Native American inmates, based on fiscal constraints.  Perlman Aff. (Dkt. No. 81-29) ¶¶ 5–6; Leonard Aff. (Dkt. No. 81-30) ¶¶ 5–7.  DOCCS balanced the requests for religious family guest events with requests for non-religious events as well as the limited number of weekends available to hold the events.  Perlman Aff. ¶ 7; Leonard Aff. ¶ 8.  The policy change involved religious leaders and DOCCS employees; thus, neither Perlman nor Leonard made the final decision for the policy change.  Perlman Aff. ¶ 8; Leonard Aff. ¶¶ 6, 10.  Furthermore, defendants explain that pursuant to a voluntary stipulation of dismissal, the policy change did not apply to Native American inmates.  Dkt. No. 81-4.


### iii.  Religious Services at Auburn

According to Robinson, Smith was keeplocked at Auburn in April 2010, October 2010, and May 2011 for prison infractions.  Robinson Aff. (Dkt. No. 81-31) ¶ 6; Dkt. No. 81-32 at 1.  Robinson denied Smith attendance at religious services in May 2011 because of Smith's history of disruptive and violent behavior.  Robinson Aff. ¶ 7.  Keeplock inmates are generally not permitted to attend religious services outside their cells and Directive # 4202 directs that the decision to permit such an attendance rests with Robinson, the Deputy Superintendent for Security.  Robinson Aff. ¶¶ 1, 9, 11; Dkt. No. 81-33 at 4.  Robinson

employed the same factors as those Shanley employed in determining whether to grant Smith's request. Robinson Aff. ¶ 12. Robinson maintains that Auburn did not hold a policy of denying all keeplock inmates' requests to attend religious services. Id. ¶ 13.

## II. Discussion

Smith contends that: (1) defendants Perlman and Leonard violated his First Amendment, Fourteenth Amendment, and RLUIPA rights when DOCCS limited family guest events for Muslim inmates to one per year but did not similarly reduce Native American family guest events (Dkt. No. 47 at 17–20); (2) defendants Martuscello and Shanley violated his First Amendments and RLUIPA rights when they denied him permission to attend religious services on three occasions in August 2009 while he was keeplocked (id. at 20–22); (3) defendants Perlman, Leonard, Hale, and Graham violated his First Amendment and RLUIPA rights when they failed to provide him with meals that combine therapeutic diet and halal restrictions (Suppl. Compl. at 9); (4) defendants Robinson and Graham violated his First Amendments and RLUIPA rights when they denied him permission to attend religious services on two occasions while in keeplock (id. at 11); and (5) defendants violated his Fourteenth Amendment equal protection rights when they failed to accommodate his religious and dietary needs while fulfilling the same needs of Jewish inmates (id. 47-4 at 10).

Defendants argue that Smith's motion should be denied because Smith failed to include a Statement of Material Facts as required by N.D.N.Y.L.R. § 7.1(a)(3). Defs.' Cross Mot. (Dkt. No. 81-6) at 3. Defendants next argue that Smith's motion seeking injunctive relief, which has already been denied (Dkt. No. 32), fails to establish any irreparable harm. Id.

10

Furthermore, defendants argue they are entitled to the personal involvement defense. Id. at 24.Defendants assert that summary judgment should be granted in their favor because Smith's claims under the First Amendment, RLUIPA, and the Fourteenth Amendment are without merit. Id.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247–48.

## B. Statement of Material Fact

Local Rule 7.1(a)(3) requires that "[a]ny motion for summary judgment shall contain a Statement of Material Facts. . . . Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." N.D.N.Y.L.R. § 7.1(a)(3) (emphasis in original). "Our District's requirements are not empty formalities.

Rules such as L.R. 7.1(a)[(3)] 'serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for trial.'" Jackson v. Broome Cnty. Corr. Facility, 194 F.R.D. 436, 437 (N.D.N.Y. 2000) (citation omitted).

Defendants argue that this District has previously dismissed a pro se plaintiff's summary judgment motion based, in part, that the plaintiff has failed to file a proper Rule 7.1 Statement of Material Facts. Rivera v. Lawrence, No. 05-CV-0967 (TJM/GHL), 2009 WL 1734735, at *7–8 (N.D.N.Y. June 18, 2009) (Dkt. No. 81-14) (adopting report-recommendation where plaintiff's motion for summary judgment was denied based on several filing defects).[5] However, this District has also, in the interest of judicial efficiency, proceeded to perform an independent review of the record and address the summary judgment motion despite the absence of a Statement of Material Facts. Urena v. Fischer, No. 08-CV-1309 (NAM/GHL), 2010 WL 2134564, at *5 (N.D.N.Y. Apr. 16, 2010). Finding Smith has substantially complied with the local rules by filing a supporting memorandum of law and exhibits, a declaration, and an affidavit of service, as well as defendants' pending cross motion before the Court addressing the same claims, in the interest of judicial efficiency, the Court proceeds to address both Smith's motion and defendants' cross motion.

Accordingly, defendants' cross motion on this ground is denied.

---

[5] All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

## C. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[6]

---

[6] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010)

### i. DOCCS Policies

Defendants Perlman, Leonard, Graham, and Hale argue that Smith failed to establish their personal involvement in the reduction of the number of Islamic religious family events per year as well as the prohibition against combining religious and therapeutic diets because those are DOCCS policies that they merely followed. Defs.' Cross Mot. at 24–25.

In this case, Perlman responded to Smith's complaints indicating that there were no plans to reinstate an additional family guest event as well as authored and distributed a memoranda that outlined the religious calendar with the number of family guest events. Dkt. Nos. 47-2 at 20–23, 47-3 at 1. Ministerial Services, of which Leonard is the director, provided guidance to CORC when asked to issue a decision for Smith's grievance on the family guest event policy. Dkt. No. 47-2 at 12. Graham denied Smith's grievance on dietary accommodations, stating Smith was required to choose either a therapeutic or religious diet, as well as the grievance on attending Friday services because of Smith's disciplinary history. Hale had signed two CORC decisions denying Smith dietary accommodations and attendance of Friday services. Viewing the facts in the light most favorable to the pro se litigant, given the above evidence, Smith has alleged that these defendants were involved in the continuation of the allegedly unconstitutional policies. Colon, 58 F.3d at 873; see also McClary v. Coughlin, 87 F. Supp. 2d 205, 215 (W.D.N.Y. 2000) ("Personal involvement does not hinge on who has the ultimate authority for constitutionally offensive decisions. Rather, the proper focus is the defendant's direct participation in, and connection to, the constitutional deprivation.").

---

(disagreeing that Iqbal eliminated Colon's personal involvement standard).

Accordingly, defendants' motion on this ground should be denied.

### ii. Hale

A material factual issue exists with respect to Hale's personal involvement in the alleged constitutional violations. Smith contends that Hale was personally involved in the alleged constitutional violations by signing the CORC denials of his grievances. "[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (Dkt. No. 81-13) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted)). However, "while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481L, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F. Supp. 2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74–75 (2d. Cir.1996)). Here, a factual dispute exists as to whether Hale had proactively participated in CORC's decision-making process. In his CORC appeals, Smith stated that his religious and other constitutional rights were violated. Dkt. No. 47-4 at 21, 32. Yet, defendants do not provide any supporting affidavit or documents to argue that Hale did not proactively review the appeals. As such, this is sufficient to create an issue of fact with respect to Hale's personal involvement in the alleged constitutional violations. Celotex Corp., 477 U.S. at 323

Accordingly, defendants' motion on this ground should be denied.

### iii. Martuscello

Smith has failed to show that Martuscello was personally involved in the alleged constitutional violations. The Court found that in his amended complaint, Smith had "alleged that Martuscello created an unconstitutional policy, or at least allowed such a policy to continue" with respect to denying keeplocked inmates from attending religious services. Dkt. No. 38 at 13. However, Martuscello attested that no such blanket policy existed. Rather, Martuscello and Shanley both attested that Shanley was tasked with reviewing keeplock inmates' requests, including Smith's, on a case-by-case basis in accordance with DOCCS Directive. Martuscello Aff. ¶ 8; Shanley Aff. ¶¶ 17–18, 20; Dkt. No. 81-27 (Directive #4202). Further, defendants submitted DOCCs documents showing that Smith was denied participation due to his past disciplinary history. Morever, Smith does not proffer any factual allegations or support to show the contrary. As such, Smith's conclusory allegations are insufficient to create a material issue of fact. Celotex Corp., 477 U.S. at 323.

Accordingly, defendants' motion on this ground should be granted.


### D. First Amendment

The First Amendment protects the right to free exercise of religion. U.S. CONST. amend. I; see generally Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)). This right is not absolute and

can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

To make a claim under the First Amendment, the inmate must establish at the threshold that his sincerely held religious beliefs were substantially burdened[7] by the challenged conduct. Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing Ford, 352 F.3d at 591). "A substantial burden is more than a mere inconvenience" but "involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs." Gill v. Defrank, No. 98-CV-7851(NRB), 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), aff'd, 8 F. App'x 35 (2d Cir. 2001) (citing inter alia Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996)). The defendants must then identify the legitimate penological interests justifying the challenged conduct. Salahuddin, 467 F.3d at 274–75. The burden shifts back to the inmate to show that such interests are irrational. Id. In making a reasonable determination,

---

[7] In the Second Circuit, it is uncertain whether the "substantial burden" test, or a lesser "burdened" test is employed in carrying out a free exercise claim analysis. Scott v. Shansiddeen, No. 12-CV-84, 2013 WL 3187071, at *4 n.7 (N.D.N.Y. June 20, 2013) (explaining that while the Second Circuit has applied the "substantial burden" test under free exercise claims in § 1983 cases, the Circuit has also explicitly refused to adopt the test). In this case, because the Court finds that legitimate and reasonable penological interests justified defendants' actions, we need not decide which standard is appropriate. Majid v. Fischer, No. 07-CV-4585(NRB), 2009 U.S. Dist. LEXIS 71616, at *14 n.7 (S.D.N.Y. July 31, 2009) (Dkt. No. 81-11).

> The <u>Turner</u> Court determined that the factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

<u>Benjamin</u>, 905 F.2d at 574 (citing <u>Turner v. Safley</u>, 483 U.S. 78, 89–91 (1987)); <u>see</u> <u>also</u> <u>Salahuddin</u>, 467 F.3d at 274 (citing the same).  Defendants do not dispute that Smith's religious beliefs are sincerely held.

### 1. Family Guest Events

"[A] generally applicable policy will not be held to violate a [prisoner's] right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.'" <u>Hall v. Ekpe</u>, 408 F. App'x 385, 387–88 (2d Cir. 2010) (citing <u>Redd v. Wright</u>, 597 F.3d 532, 536 (2d Cir. 2010)).

Here, defendants argue that the reduction on the number of religious family events was due to legitimate penological interests consisting of fiscal and staffing concerns in light of the growing demand for limited weekend events.  <u>Salahuddin</u>, 467 F.3d at 274–75.  Such interests are rationally related to the policy changes.  <u>Turner</u>, 483 U.S. at 89–91.  This rational relationship is bolstered by the policy change being applied to all recognized religions except for Native Americans and as a decision collectively made by religious leaders and prison officials.  <u>See, e.g.</u>, Dkt. Nos. 47-1 at 12–16 (religious calendar for 2008), 17–20 (religious calendar for 2007), 47-2 at 2–4 (religious calendar for 2011), 47-3 (religious calendar for 2010).  Further, Smith was able to practice his religion through

access to a special religious menu, prayer, and a day off from work.  Perlman Aff. ¶ 9; Dkt. No. 47-1 at 15.  Moreover, reverting the policy back to two family religious events per year for all religious groups affected would be counterproductive to the objective in reducing financial and administrative burden.  Lastly, no viable and ready alternatives were proffered which accommodate the right and satisfy the governmental interest.  Cf. Dkt. No. 47-4 at 19 (grievance enumerating demands but are not alternatives).  Given the above, defendants have proffered legitimate penological interests that reasonably burden Smith's religious beliefs.  Salahuddin, 467 F.3d at 274–75.

Accordingly, defendants' motion on this ground should be granted.


## 2.  Attendance at the Friday Services

""[P]risoners have a constitutional right to participate in congregate religious services." Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted).  "Confinement in keeplock does not deprive prisoners of this right."  Id. (citations omitted).  While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."  Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted).   "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests."  Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted).  The same analysis is undertaken when there is an allegation that "an individual dec[ided] to

deny a prisoner the ability to engage in some requested religious practice." Ford, 352 F.3d at 595 n.15 (citations omitted).

The Supreme Court has previously recognized the importance of these Friday services, explaining that they are "commanded by the Koran and must be held . . . after the sun reaches its zenith and before the . . . afternoon prayer." O'Lone v. Estate of Shabazz, 482 U.S. 342, 345 (1987); see also Salahuddin, 993 F.2d at 307 ("Participation in Jumu'ah [the Muslim Friday prayer service,] is the central observance of Islam."). Accordingly, significant importance attaches to the prayer services.

However, some courts have determined that individual prayer is adequate to fulfill a Muslim's prayer obligations and that legitimate excusals from prayer services do not substantially burden religious beliefs. See Abdur-Rahman v. Michigan Dep't of Corr., 65 F.3d 489, 492 (6th Cir. 1995) (concluding that because "the Islamic religion expressly excuses individuals who are in prison for good cause [and that] . . . Friday services are not fundamental to [the Islamic] religion . . . " no substantial burden had occurred); Boomer v. Irving, 963 F. Supp. 227, 230–31 (W.D.N.Y. 1997) (explaining that "two Muslim Imams [testified] . . . that an inmate's failure or inability to attend one [prayer] service does not substantially interfere with the inmate's obligations as a practicing Muslim because those obligations may be fulfilled by individual prayer offerings with no adverse consequences.").

Here, a logical connection exists between the regulation and the legitimate government interests asserted. Turner, 483 U.S. at 89–91. Shanley and Robinson attested that inmates in keeplock are generally not permitted to attend religious services outside their cells. However, under Directive #4202 inmates may make a written request for such a

21

attendance and Shanley and Robinson were tasked with granting or denying these requests upon a review of several factors. Both Shanley and Robinson attested, along with submission of misbehavior reports and disciplinary records, that they denied Smith's requests, at Coxsackie and Auburn respectively, due to Smith's disciplinary history of violence and Smith was determined to be a security risk. Smith was denied permission to attend the services for the same reasons which led to his keeplock confinement, that he had threatened a corrections officer and received a disciplinary confinement for such actions. It is well-established that institutional security is a valid penological objective. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted). Furthermore, the Muslim faith allows "excuse[s] from Friday services for [legitimate] reasons . . . ." which would include releases precluded because of security risks. Abdur-Rahman, 65 F.3d at 491–92 (dismissing inmate's First Amendment claims when his requests to leave his work assignment to attend religious services was denied due to the resulting security threat); Boomer, 963 F. Supp. at 230–31. Accordingly, Shanley and Robinson acted pursuant to legitimate penological concerns.

Further, Smith and other Islamic inmates in keeplock had the alternative means to exercise their religion by being able to practice and pray in their own cells. Smith does not allege, nor does the record reflect the contrary, that he was prevented from practicing in his cell while keeplocked. Furthermore, permitting inmates with histories of violent behavior to attend out-of-cell religious activities could jeopardize the safety and security for the prison's facility and staff. Moreover, Smith does not proffer other ready alternatives that accommodate his free exercise right while satisfying the asserted penological interests.

Additionally, courts have held that denial of two religious services to be a de minimis burden on an inmate's ability to freely exercise his religion.  Smith v. Graziano, No. 08-CV-469 (GLS/RFT), 2010 WL 1330019, at *9 (N.D.N.Y. Mar. 16, 2010) (Dkt. No. 81-18) (citations omitted).  It follows that Smith's denial of access to Friday services, three at Coxsackie and two at Auburn, did not substantially burden Smith's right to exercise his religion.

Accordingly, defendants' motion on this ground should be granted.


### 3.  Dietary Restrictions

The Free Exercise Clause extends to an inmate's diet and participation in religious meals.  See McEachin v,. McGuinnis, 357 F.3d 197, 204–05 (2d Cir. 2004); Ford, 352 F.3d at 597.  The Constitution requires that an inmate, at a minimum, "be provided with nutritionally adequate meals . . . ."  Walker v. Fischer, No. 10-CV-01431 (MAD/DEP), 2012 WL 1029614, at *6 (N.D.N.Y. Mar. 26, 2012) (citing Word v. Croce, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001)).  In addition, the Second Circuit directs "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir. 1975); Ford, 352 F.3d at 597.  Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights."  McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004).  "Courts, however, are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible."  Benjamin, 905 F.2d at 579.

In this case, Smith has failed to establish a factual issue with regard to his claim based

on dietary needs.  DOCCS's dietary policy against combining RAM and therapeutic diets is reasonably related to a legitimate penological interest.  First, there is a rational relationship between the regulation and the legitimate government interests asserted because including halal proteins, which has high sodium content, in a therapeutic diet, would vitiate the therapeutic diet's purpose.  "Courts have consistently held that DOCCS'[s] [RAM] is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required." Walker, 2012 WL 1029614, at *7 (citation omitted).  Furthermore, adding halal proteins to the therapeutic diet, even once per week, would increase costs for DOCCS.  See Majid v. Fischer, No. 07-CV-4585(NRB), 2009 U.S. Dist. LEXIS 71616, at *18–19 (S.D.N.Y. July 31, 2009) (Dkt. No. 81-11) ("[It] is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups, and that the RAM program, which was 'designed to accommodate the needs of inmates who may have different dietary requirements due to their religious beliefs or personal dietary beliefs . . . in an economically viable way' is rationally related to that interest." (citations omitted)); see also Williams v. Senkowski, 00-CV-1580, at *33 (N.D.N.Y. Aug. 20, 2003) (Dkt. No. 81-21) (finding a logical connection between the denial of vegetarian meals and the legitimate government interest to support it, that it would be financially and administratively unfeasible).

Second, it is undisputed that Muslim inmates have alternative means of obtaining halal proteins.  Smith can supplement his diet with halal proteins by receiving them through care packages or purchasing them through the facility's commissary.  See Majid, 2009 U.S. Dist. LEXIS 71616, at *19 (finding plaintiffs admitted they had could access halal items through the prison facility's commissary or care packages).  Furthermore, if the commissary does

not carry halal proteins, Smith can petition the Inmate Liaison Committee to have halal products obtained for sale.

Third, providing a separate halal meal program for Smith would significantly burden prison resources and staff. Majid, 2009 U.S. Dist. LEXIS 71616, at *19 (noting the RAM program was created to accommodate as many inmate groups as possible). DOCCS provides meals for 54,700 inmates while considering several factors in creating a standardized state-wide menu. Creating a separate program from RAM would impose economic burdens on DOCCS. For example, Jewish inmates consume CAD, which are single-serve packages that are more expensive than other meal options. Further, as discussed, including and increasing a halal option to the therapeutic diet even, once per week, would cause cost increases for DOCCS.

And lastly, while Smith proffers alternatives to accommodate the right, such alternatives are not viable. By reference in his supplemental complaint to a grievance filed, Smith proposed that DOCCS replace all non-halal proteins with halal proteins. Dkt. No. 47-4 at 27–30. Thus, rather than serving halal proteins exclusively to Muslim inmates, all inmates would consume halal proteins. Id. For the reasons discussed above, this alternative implicates DOCCS's legitimate penological interests. According to Culkin, halal proteins are more expensive than non-halal proteins. It follows that replacing all non-halal items with halal items would be counterproductive to DOCCS's asserted penological interests. Given the above reasons, Smith has failed to establish a material factual dispute with regard to his claim based on dietary accommodations. Celotex Corp., 477 U.S. at 323.

Accordingly, defendants' motion on this issue should be granted.

## E. RLUIPA

The RLUIPA provides that

> [n]o government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to an
> institution . . . unless the government demonstrates that
> imposition of the burden on that person (1) is in furtherance of a
> compelling governmental interest; and (2) is the least restrictive
> means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.  In a RLUIPA claim, "[t]he prisoner must show at the threshold that

the disputed conduct substantially burdens his sincerely held religious beliefs.  The

defendants then bear the relatively limited burden of identifying the legitimate penological

interests that justify the impinging conduct."  Salahuddin, 467 F.3d at 274–75.

> Congress, in enacting the RLUIPA, anticipated that Courts would
> give "due deference to the experience and expertise of prison
> and jail administrators in establishing necessary regulations and
> procedures to maintain good order, security and discipline,
> consistent with consideration of costs and limited resources.
> Nevertheless, prison officials cannot simply use the words
> "security" and "safety," and expect that their conduct will be
> permissible.

Singh v. Goord, 520 F. Supp. 2d 487, 499 (S.D.N.Y. 2007) (internal citations omitted).

   As an initial matter, Smith cannot obtain certain relief from defendants pursuant to the

RLUIPA claim.  Defendants are correct to argue that Smith is barred from obtaining

monetary damages from them in their individual or official capacities under the RLUIPA

claim.  Pugh v. Goord, 571 F. Supp. 2d 477, 506–09 (S.D.N.Y. 2008).  Thus, Smith cannot

recover monetary damages under this claim.

   As discussed above, Smith has failed to establish that defendants' conduct infringed his

religious beliefs and practices.  Moreover, because "when reviewing a claim under RLUIPA,

a court must afford due deference to the experience and expertise of prison and jail

administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," Smith's claims should be denied for the alternative reasons also discussed above. Hamilton v. Smith, No. 06-CV-805, 2009 WL 3199520, at *7 (N.D.N.Y. Sept. 30, 2009) (internal quotation marks and citations omitted).

Accordingly, defendants' motion on this ground should be granted.


## F. Fourteenth Amendment

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas, 610 F. Supp. 2d at 209 (internal quotation marks and citations omitted). However, "[t]he Supreme Court has specifically held that in the prison context, the Equal Protection clause does not require that every religious sect or group within a prison . . . have identical facilities or personnel." Pugh, 571 F. Supp. 2d. at 502 (internal quotation marks and citations omitted). Thus, even if Smith alleges that two groups were similarly situated,

disparate treatment may still have been permissible if the distinctions were reasonably related to legitimate penological interests.  Id.

### 1.  Family Guest Events

In this case, Smith claims that his equal protection rights were violated when he was only permitted one family participation event per year as opposed to two.  Smith argues that as a Muslim inmate, he was treated differently from Native Americans, who have nine family participation events per year.  Smith's equal protection claim here fails as he does not show that the removal of one family participation event was a result of intentional or discriminatory conduct.  The record is devoid of any such evidence showing that the removal had stemmed from animus towards him or Islamic inmates.  In fact, defendants attested, which is supported by record evidence, that the same reduction was imposed on inmates of other religious affiliations.  Moreover, defendants explain that the Native American family guest events are designated by a stipulation.  This strengthens the defendants' position that the disparity was not a result of purposeful discrimination.  Phillips, 408 F.3d at 129.  Thus, Smith has failed to demonstrate an issue of material fact with respect to his equal protection based on the policy change.

Accordingly, defendants' motion on this ground should be granted.

### 2.  Religious Friday Services

Smith contends that Robinson violated his equal protection rights when he was denied access to religious Friday services while keeplocked.  Such a claim must fail as a matter of law.  As previously discussed by Memorandum-Decision and Order, Smith was not similarly

situated to inmates in the general population because he was adjudged guilty of a disciplinary charge that resulted in keeplock confinement. Dkt. No. 38 at 19–20; Dkt. No. 33 at 21–22. Second, Robinson did not intentionally discriminate against Smith. Phillips, 408 F.3d at 129. Smith was precluded from attending services for legitimate penological reasons which are unrelated to Smith's religious affiliation. There is no record evidence showing the contrary. Third, Smith's claim that all keeplocked inmates were prevented from attending any religious services are conclusory and unsupported. Smith does not identify other inmates who were also denied attendance to religious services due to their religious affiliations. Thus, Smith has failed to establish an issue of fact with respect to the equal protection claim against Robinson. Celotex Corp., 477 U.S. at 323.

Accordingly, defendants' motion on this ground should be granted.


### 3. Dietary Restrictions

Lastly, Smith has failed to show a genuine issue of fact with respect to the claim that he was treated differently than others similarly situated. First, Smith does not proffer any factual allegations that he was treated differently from Jewish inmates as a result of intentional or purposeful discrimination. Phillips, 408 F.3d at 129. The record is devoid of any evidence showing the alleged disparity in treatment between Muslim and Jewish inmates was a result of intentional or purposeful discrimination. Simmons v. Robinson, No. 07-CV-7383, 2010 WL 5538412, at *17–18 (S.D.N.Y. Jan. 4, 2011) (Dkt. No. 81-17). Rather, as previously discussed, DOCCS has a legitimate interest in meeting the dietary needs of multiple inmate groups in a cost-effective manner. Creating a separate Halal meal for Muslims would impose unduly costs on the prison system. Second, there is no evidence

showing that CAD can be combined with a therapeutic menu while RAM cannot be combined with a therapeutic menu.  In fact, the record indicates that all religious diets are strictly followed and cannot be combined with therapeutic menus.  As such, Smith cannot establish an equal protection claim based on denied dietary accommodations.

Accordingly, defendants' motion on this ground should be granted.


### G.  Qualified Immunity

Defendants claims that even if Smith's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be addressed with respect to

Smith's First and Fourteenth Amendment claims because, as discussed <u>supra</u>, it has not been shown that defendants violated Smith's First and Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III.  Motion for Temporary Restraining Order and Preliminary Injunction

Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" <u>Moore v. Consol. Edison Co. of New York, Inc.</u>, 409 F.3d 506, 510 (2d Cir. 2005) (quoting <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997)).  The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. <u>Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.</u>, 598 F.3d 30, 35, 38 (2d Cir. 2010).  To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor.  <u>Id</u>. at 35; <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 405–06 (2d Cir. 2011).  However, when the moving party seeks "a mandatory preliminary injunction that alters the status quo by commanding some positive act," the burden is even higher. <u>Citigroup Global Mkts.</u>, 598 F.3d at 35 n.4 (internal quotation marks, alterations, and citations omitted); <u>see</u> <u>also</u> <u>Jolly v.Coughlin</u>, 76 F.3d 468, 473 (2d Cir. 1996).  Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  <u>Citigroup Global Mkts.</u>, 598 F.3d at 35 n.4 (internal

quotation marks omitted).  The same standards used to review a request for a preliminary

injunction govern consideration of an application for a temporary restraining order.  <u>Local

1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.</u>, 965 F.2d

1224, 1228 (2d Cir. 1992); <u>Perri v. Bloomberg</u>, No. 06-CV-403 (CBA)(LB), 2008 WL

2944642, at * 2 (E.D.N.Y. July 31, 2008).  The district court has wide discretion in

determining whether to grant a preliminary injunction.  <u>Moore</u>, 409 F.3d at 511.

Smith seeks a temporary restraining order and a preliminary injunction requiring

defendants to accommodate his religious dietary needs and his medical dietary needs by

substituting halal meat for haram meat in his therapeutic diet.  Dkt. No. 79.  Here, however,

the Court has already recommended that defendants' motion for summary judgment be

granted and that Smith's second amended complaint be dismissed with prejudice.

Accordingly, the Court recommends that Smith's motion for a temporary restraining order

and preliminary injunction (Dkt. No. 79) be denied.


## IV.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' cross

motion for summary judgment (Dkt. No. 81) be **GRANTED**, Smith's motion for partial

summary judgment (Dkt. No. 73) be **DENIED**, and Smith's motion for a temporary

restraining order and preliminary injunction (Dkt. No. 79) be **DENIED**.   It is further

**RECOMMENDED** that Smith's second amended complaint (Dkt. No. 47) be dismissed with

prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen

(14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c)

(citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** <u>Roldan v. Racette</u>, 984 F.2d

85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  February 18, 2014
        Albany, New York

                                     Christian F. Hummel
                                     U.S. Magistrate Judge