**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AUREL SMITH,**

                                        **Plaintiff,**

    **vs.**                                                    **09:11-cv-00020**
                                                            **(MAD/CFH)**

**KENNETH PERLMAN, Deputy Commissioner**
**of Programs, NYS Department of Correctional**
**Services; MARK LEONARD, Director of**
**Ministerial Services, NYS Department of**
**Correctional Services; DANIEL MARTUSCELLO,**
**Superintendent of Coxsackie Correctional Facility;**
**CAPTAIN R. SHANLEY, Captain, Acting Deputy**
**Superintendent of Security at Coxsackie Correctional**
**Facility; JEFFREY A. HALE; HARRY S. GRAHAM,**
**Superintendent of Auburn Correctional Facility;**
**G. ROBINSON, Deputy Superintendent of Auburn**
**Correctional Facility,**

                                        **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**AUREL SMITH**
02-A-6279
Attica Correctional Facility
 Box 149
Attica, New York 14011
Plaintiff *pro se*

**OFFICE OF THE NEW YORK**              **KEVIN M. HAYDEN, AAG**
**STATE ATTORNEY GENERAL**
Albany Office
The Capitol
Albany, New York 12224
Attorneys for Defendants


**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brought this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights under the First and Fourteenth Amendments, as well as his rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See* Dkt. No. 1; Dkt. No. 47. Now before the Court are Plaintiff's motion to accept the filing of late objections to the Magistrate Judge's Report-Recommendation and Order and motion for reconsideration, pursuant to Fed. R. Civ. P. 59(e), of the Court's March 13, 2014 Order denying Plaintiff's motions for partial summary judgment and injunctive relief and granting Defendants' cross motion for summary judgment. Dkt. No. 93; Dkt. No. 94.

## II. BACKGROUND

The factual background and full procedural history of this case is set forth in the Court's prior orders, the parties' familiarity with which is assumed. Relevant here, on August 23, 2013, Plaintiff moved for partial summary judgment against Defendants Perlman and Leonard on his claims alleging violations of the Fourteenth Amendment and RLUIPA based on the DOCCS policy of limiting religious family guest events for Muslim inmates to one per year and against Defendants Perlman, Leonard, Hale, and Graham on his claims alleging violations of the First and Fourteenth Amendments and RLUIPA based on Defendants' refusal to provide Plaintiff with meals combining therapeutic diet and halal restrictions. Dkt. No. 73. On October 28, 2013, Plaintiff moved for a temporary restraining order and preliminary injunction requiring Defendants to accommodate his religious and medical dietary needs by substituting halal meat for haram meat in his therapeutic diet. Dkt. No. 79. Defendants filed an opposition to Plaintiff's motion for

partial summary judgment and cross motion for summary judgment on all counts on November 27, 2013.  Dkt. No. 81.

In a Report-Recommendation and Order dated February 18, 2014, Magistrate Judge Christian F. Hummel recommended that the Court deny Plaintiff's motions for partial summary judgment and injunctive relief, grant Defendants' cross motion for summary judgment, and dismiss this case.  Dkt. No. 90.  Neither party filed objections to Magistrate Judge Hummel's Report-Recommendation and Order by the filing deadline of March 7, 2014.  Finding no clear error or manifest injustice in Magistrate Judge Hummel's Report-Recommendation and Order, the Court adopted the Report-Recommendation and Order in its entirety in an Order dated March 13, 2014 and entered judgment in Defendants' favor.  Dkt. No. 91; Dkt. No. 92.

On March 24, 2014, Plaintiff filed a letter motion requesting that the Court accept his late filing of objections addressing specific portions of Magistrate Judge Hummel's report.  Dkt. No. 93.[1]  Plaintiff's primary objection to the Report-Recommendation and Order was that Magistrate Judge Hummel erred in concluding that Plaintiff did not respond to Defendants' cross motion for summary judgment, thereby mistakenly taking Defendants' motion as unopposed and evaluating Defendants' factual assertions in the absence of Plaintiff's response and exhibits.  *See id.* at 4.  Plaintiff then filed a motion for reconsideration of the Court's Order adopting the Report-Recommendation and Order, which again contended that Plaintiff was prejudiced to the extent

---

[1] Plaintiff asserts that he deposited his objections in a mailbox at the Attica Correctional Facility, where he is currently housed, on February 28, 2014, and the facility returned the objections to him on March 6, 2014 for insufficient postage.  *Id.* at 2-3.  Plaintiff contends that he did not have access to a postage scale to determine sufficient postage for his filings because he was not permitted to visit the law library where the postage scale is located between the time of the issuance of the Report-Recommendation and Order and the deadline for filing his objections.  *Id.* at 3.  Because the Court received Plaintiff's objections to the Report-Recommendation and Order after issuing its Order, the Court will treat the motion as one for reconsideration in conjunction with the Plaintiff's subsequent motion.

that Magistrate Judge Hummel's analysis overlooked Plaintiff's response to Defendants' cross motion for summary judgment, reply to the opposition of his motion for partial summary judgment, and related exhibits. *See* Dkt. No. 94-1. Defendants oppose Plaintiff's motion to reconsider, arguing that, "[d]espite his claims to the contrary, Plaintiff's reply papers were accepted for filing before the Report-Recommendation was issued" and that "Plaintiff has failed to dispute the law relied upon by the Court when dismissing his action." Dkt. No. 95 at 5.

### III. MOTION FOR RECONSIDERATION

**A.**    **Legal Standards**

Rule 59(e) of the Federal Rules of Civil Procedure provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). The courts in this Circuit generally permit motions to reconsider grants of summary judgment to be brought under Rule 59(e). *Patel v. Lutheran Med. Ctr., Inc.*, 775 F. Supp. 592, 596 (E.D.N.Y. 1991); *see also Travelers Ins. Co. v. Buffalo Reinsurance Co.*, 739 F. Supp. 209, 213 (S.D.N.Y. 1990) (vacating a grant of summary judgment pursuant to Rule 59(e)).

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Under Rule 59(e), "a court is justified in reconsidering its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent obvious injustice." *Nossek v. Bd. of Educ. of Duanesburg Cent. Sch. Dist.*, No. 94-CV-219, 1994 WL 688298, *1 (N.D.N.Y. Nov. 10, 1994). A motion for reconsideration "is not to be used as a means to reargue

matters already argued and disposed of by prior rulings or to put forth additional arguments which [a party] could have made but neglected to make before judgment." *Duane v. Spaulding & Rogers Mfg. Inc.*, No. 92-CV-305, 1994 WL 494651, *1 (N.D.N.Y. Aug. 10, 1994) (internal quotations omitted).

**B.    Analysis**

Here, Plaintiff contends that reconsideration is necessary to prevent manifest injustice because Magistrate Judge Hummel and the Court did not consider his reply papers and exhibits in deciding the underlying motions.  In a text order dated February 14, 2014, Magistrate Judge Hummel accepted for filing Plaintiff's reply to the opposition of Plaintiff's motion for partial summary judgment and Plaintiff's response to Defendants' cross motion for summary judgment. Dkt. No. 89.  However, the Report-Recommendation and Order stated that "Smith does not oppose defendants' cross motion.  Upon requests, this Court twice granted Smith an extension of time to respond to defendants' cross motion, the most recent deadline being February 5, 2014. The deadline expired and Smith never responded."  Dkt. No. 90 at 2 (citations omitted).  Thus, the Report-Recommendation and Order clearly indicates that despite having accepted Plaintiff's late reply papers, Magistrate Judge Hummel did not consider the reply papers or attached exhibits in evaluating the parties' respective motions.[2]  The Court, which adopted Magistrate Judge Hummel's Report-Recommendation and Order in its entirety, also failed to examine Plaintiff's reply papers in its analysis of the parties' respective motions.

---

[2]  The Court's view that Plaintiff's reply papers were in fact overlooked, despite Defendants' arguments to the contrary, is reinforced by the fact that the Report-Recommendation and Order does not include a single reference or citation to Plaintiff's reply papers or exhibits outside of the language quoted above.

Thus, Plaintiff's motion for reconsideration does not attempt to raise arguments or evidence Plaintiff neglected to put forth earlier, but rather urges the Court to grant due consideration to overlooked evidence Plaintiff presented. Along with his reply papers, Plaintiff filed approximately 185 pages of exhibits, including, *inter alia*, Defendants' responses to interrogatories, records related to Plaintiff's grievances filed with DOCCS, and various DOCCS internal communications and policy materials. *See* Dkt. No. 88-3. Such evidence "might reasonably be expected to alter the conclusion reached by the court" upon consideration of a motion for summary judgment. *Shrader*, 70 F.3d at 257. In the interest of avoiding manifest injustice, Plaintiff is entitled to have the Court consider this evidence. Accordingly, the Court hereby **ORDERS** that Plaintiff's motion for reconsideration is **GRANTED** and the Court's Order dated March 13, 2014 is **VACATED**.

## IV. RECONSIDERATION AND ORDER

Having thoroughly reviewed Plaintiff's reply papers, attached exhibits, objections to Magistrate Judge Hummel's Report-Recommendation and Order, and motion for reconsideration, the Court now reviews Magistrate Judge Hummel's findings and recommendations.

A.      **Standard of Review**

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept,

reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other

citations omitted).  The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education.  *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).  However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment.  *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)).  Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment.  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B.  Statement of Material Fact**

Defendants argued that Plaintiff's motion for partial summary judgment should be denied because Plaintiff failed to include a Statement of Material Facts as required by N.D.N.Y.L.R. § 7.1(a)(3).  Magistrate Judge Hummel found that Plaintiff substantially complied with Local Rule 7.1(a)(3) by filing a supporting memorandum of law and exhibits, a declaration, and an affidavit of service.  Having reviewed Magistrate Judge Hummel's reasoning on this issue and finding no clear error, the Court adopts this portion of the Report-Recommendation and Order.

**C.  Personal Involvement**

Defendants Leonard, Perlman, Graham, Hale, and Martuscello moved for summary judgment on the claims against them based upon lack of personal involvement.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  Although a defendant that occupies a supervisory position may not be held liable based solely on the defendant's position of authority,

> [t]he personal involvement of a supervisory defendant may be
> shown by evidence that: (1) the defendant participated directly in
> the alleged constitutional violation, (2) the defendant, after being
> informed of the violation through a report or appeal, failed to
> remedy the wrong, (3) the defendant created a policy or custom
> under which unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant was
> grossly negligent in supervising subordinates who committed the
> wrongful acts, or (5) the defendant exhibited deliberate indifference
> to the rights of inmates by failing to act on information indicating
> that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Magistrate Judge Hummel concluded that Defendants Perlman, Leonard, and Graham were personally involved in the alleged constitutional deprivations and should be denied summary judgment on this ground. Magistrate Judge Hummel further concluded that a genuine dispute of material fact existed with respect to Defendant Hale's personal involvement and that summary judgment for Defendant Hale should also be denied on this ground. Upon review, the Court finds no clear error or manifest injustice and adopts this portion of the Report-Recommendation and Order.[3]

---

[3] Plaintiff agrees with Magistrate Judge Hummel's conclusions, but objects to his analysis pertaining to Defendant Perlman's personal involvement because it did not address Defendant Hale's interrogatory response asserting that Defendant Perlman made the decision to reduce the number of Islamic family guest events. Dkt. No. 88-3 at 21. The Court notes that this fact is disputed by Defendant Perlman's own interrogatory, *see* Dkt No. 88-3 at 40, and agrees with Magistrate Judge Hummel's conclusion that even if Defendant Perlman did not personally make the final decision to institute this policy, his actions in carrying out the policy were sufficient for a finding of personal involvement at the summary judgment stage. Plaintiff also objects that Magistrate Judge Hummel did not address the fact that "by signing into effect the CORC decision, Defendant Hale signed into effect departmental memoranda to be acted upon thenceforth." This fact does not substantively impact the personal involvement analysis, which focuses not on the effect of denying a grievance, but rather whether the official "proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Molano v. Bezio*, No. 10-CV-6481L, 2012 WL 1252630, *5 (W.D.N.Y. Apr. 13, 2012) (quotations omitted).

Plaintiff objects to Magistrate Judge Hummel's finding that Defendant Martuscello lacked personal involvement in the alleged constitutional violations. Plaintiff alleges that Defendant Martuscello was personally involved in the alleged constitutional violations because when Defendant Martuscello served as Deputy Superintendent of Security, he created a custom of not allowing keeplocked inmates to attend religious services "in an arbitrary and blanketed fashion" or allowed such custom to continue. *See* Dkt. No. 38 at 13; Dkt. No. 93-1 at 20. Defendants Martuscello and Shanley both attested that no such blanket policy existed and that keeplocked prisoners' requests to attend religious services were handled on a case-by-case basis in accordance with DOCCS Directive 4202. Dkt. No. 81-22 at 4; Dkt. No. 81-28 at 2-3. Directive 4202 directs that "[t]he final decision to permit attendance [at congregate religious services by keeplocked inmates] rests with the Deputy Superintendent for Security." Dkt. No. 81-27 at 4. In support of his claim that such an impermissible blanket policy nonetheless existed and was permitted by Defendant Martuscello, Plaintiff introduced a grievance he submitted on August 19, 2009, in which Plaintiff claimed:

> Today, at approximately 1:05 pm, I encountered D.S.S. Martuscello, in person, while he conducted rounds on the F-3 housing unit. I informed him of my 08/08/09 and 8/15/09 submitted requests to his office. To this D.S.S. Martuscello inquired whether I was confined via keeplock or I.P.C., to which I informed him that I was keeplocked (for a disciplinary infraction). In response thereto, D.S.S. Martuscello immediately, and in absolute terms, stated that I would not be allowed to go (to religious services) under any circumstances as I was a threat to his security. Notingly [sic], the reasons for my infraction weren't even mentioned/discussed.

Dkt. No. 88-3 at 53.

Viewing this evidence in the light most favorable to Plaintiff, the nonmoving party, the Court finds it sufficient to create an issue of material fact with respect to Defendant Martuscello's

personal involvement in the creation or continuance of the alleged unconstitutional policy. Defendant Martuscello's alleged statement that Plaintiff would not be permitted to attend religious services solely because he was in disciplinary keeplock can reasonably be viewed as evidence that Defendant Martuscello knew and approved of an informal policy or custom of prohibiting all keeplocked inmates from attending congregate religious services. Permitting an unconstitutional policy to operate is sufficient to establish a supervisor's personal involvement in an alleged constitutional violation. Therefore, Defendant Martuscello's motion for summary judgment on this ground is denied.

**D.     First Amendment and RLUIPA Claims**

Plaintiff alleges that his First Amendment and RLUIPA rights were violated by Defendants Perlman and Leonard when DOCCS reduced the number of Islamic holy days designated as family events from two to one. Plaintiff also alleges that his rights were violated by Defendants Shanley, Martuscello, Robinson, and Hale when they refused to allow Plaintiff to attend congregate religious services while in keeplock. Finally, Plaintiff alleges that Defendants Perlman, Leonard, Hale, and Graham violated his free exercise rights when they denied Plaintiff's request to incorporate halal meats into his therapeutic diet.[4]

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. U.S. Const. Amend. I. Although "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," such protection is balanced against "the interests of prison officials charged

---

[4] In light of Plaintiff's numerous specific objections to Magistrate Judge Hummel's Report-Recommendation and Order based on facts and arguments from Plaintiff's reply papers and exhibits, the Court will make *de novo* determinations on Plaintiff's constitutional and RLUIPA claims.

with complex duties arising from the administration of the penal system," and prisoner's free exercise claims "are therefore judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (internal quotations and citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is 'reasonably related to legitimate penological interests.'" *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

In order to prevail on a free exercise claim, a prisoner must show that the defendant's conduct "substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006).[5] A burden is substantial if it interferes with a practice or tenant that "'is considered central or important'" to the plaintiff's religious exercise. *See Pugh v. Goord*, 571 F. Supp. 2d 477, 499 (S.D.N.Y. 2008) (quoting *Ford*, 352 F.3d at 593-94). "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. The burden then "remains with the prisoner to 'show that these [penological] concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)).

In making a reasonableness determination, the court must consider the following:

---

[5] As Magistrate Judge Hummel noted in his Report-Recommendation, "[i]n the Second Circuit, it is uncertain whether the 'substantial burden' test, or a lesser 'burdened' test is employed in carrying out a free exercise claim analysis." Dkt. No. 90 at 18 (citations omitted); *see also Holland v. Goord*, 785 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs" (internal quotations omitted)). The Court need not decide which standard is appropriate because it finds that Defendants' conduct was justified by legitimate penological interests.

> 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin*, 905 F.2d at 574 (citing *Turner*, 482 U.S. at 89-90).

The RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). RLUIPA claims are evaluated under principles similar to those applicable to First Amendment claims, but the RLUIPA places a higher burden on defendants, who must show a compelling government interest advanced through the least restrictive means. *See Griffin v. Alexander*, No. 9:09-CV-1334, 2011 WL 4402119, *10 (N.D.N.Y. Aug. 25, 2011) (citation omitted). For a defendant to show that a practice is the least restrictive means, the defendant must show that it "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009) (internal quotations omitted). Nonetheless, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," and courts are to "apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (internal quotations omitted). RLUIPA does not authorize

13

claims for monetary damages against state officers in their official or individual capacities. *Holland*, 758 F.3d at 224.

### *1. Family Guest Events*

Plaintiff alleges that Defendants Perlman and Leonard substantially burdened his sincerely held religious beliefs by removing family guest event designation from Eid-ul-Adha, a Muslim holy day, thereby no longer permitting family guests to attend and participate in the prison's Eid-ul-Adha celebration.[6] DOCCS stopped designating Eid-ul-Adha as a family guest event under a policy change that reduced the number of designated family events for each recognized religion, with the exception of the Native American religion, to one event per year.[7] DOCCS implemented the new policy after consultation with religious leaders and various DOCCS employees. Dkt. No. 81-29 at 2; Dkt. No. 81-30 at 2. Defendants Leonard and Perlman attested that the policy was motivated by the desire to reduce the administrative costs of providing food and security for family events and the increasing difficulty of balancing growing demand for family events by different religions. Dkt. No. 81-29 at 2; Dkt. No. 81-30 at 2.

These interests are rationally related to the policy of limiting nearly all recognized religions to only one family guest event per year. Plaintiff contends that reducing the number of family events is not rationally related to reducing administrative costs because inmates pay the facility commissary a meal charge of $1.95 per adult guest and $0.50 per child guest for family event guests. *See* Dkt. No. 93-1 at 24; Dkt. No. 88-3 at 174. This argument assumes, however, that DOCCS incurs no other costs in hosting family events. Plaintiff provides no evidence in

---

[6] Defendants do not dispute that Plaintiff's religious beliefs are sincerely held.

[7] The Court will address the policy's exception for Native Americans in its discussion of Plaintiff's Fourteenth Amendment claims, *infra*.

support of his related argument that the cost of holding a family guest event for Eid-ul-Adha is insignificant. *See* Dkt. No. 88 at 37-38. Plaintiff also points to additions to the family events calendar for other religions as evidence that Defendants faced no administrative burden in balancing demand for events. *See* Dkt No. 88 at 34-35. This argument ignores that the new family events were added for religions that previously had no family events designated. The fact that the policy change enabled DOCCS to accommodate more religious groups strengthens Defendants' claim that it was rationally related to the need to balance demand from numerous groups. Lastly, Plaintiff's argument that the fact that no family event is currently scheduled for the weekend on which Eid-ul-Adha is celebrated takes too narrow a view of administrative burden, namely that DOCCS incurs no administrative burden in holding a family guest event if the event is not in direct conflict with another guest event. *See* Dkt. No. 93-1 at 22.

Under the new policy, Plaintiff has alternative means of exercising his religious rights. Plaintiff acknowledges that despite the policy change, he may continue to observe Eid-ul-Adha, as DOCCS still holds a celebration for the holiday that incorporates a special menu, prayer, and a day off from work. *See* Dkt. No. 93-1 at 24; Dkt. No. 88-3 at 145. Plaintiff introduced no evidence that he cannot fully observe Eid-ul-Adha without family guests present. In fact, Plaintiff admitted that when DOCCS did permit family members to attend Eid-ul-Adha, he never had a family guest attend the celebration. *See* Dkt. No. 81-3 at 13.[8]

Further, Plaintiff proffered no alternative for accommodating his rights that would satisfy the government's interests. His only suggested accommodations were for DOCCS to revert to its former policy recognizing Eid-ul-Adha as a family event or to recognize all "holy day events,

---

[8] Plaintiff claims that other prisoners' visitors were in fact Plaintiff's guests at unspecific events. *See id.* at 68-69. He introduces no evidence in support of this claim.

beyond the once a year restriction available for all religious groups, to those holy days in which family and guest participation is integral or important thereto." *See* Dkt. No. 93-1 at 25-27. Neither option would serve Defendants' interest in reducing fiscal and administrative burdens.

Therefore, Plaintiff has not shown that Defendants' asserted penological interests unreasonably burdened Plaintiff's religious beliefs. Accordingly, Defendants' motion for summary judgment on Plaintiff's First Amendment claims arising out of the DOCCS family event policy is granted. In light of the foregoing analysis, the Court also finds that, even if the policy change substantially burdened Plaintiff's religious exercise, Defendants' conduct advanced a compelling government interest through the least restrictive means. Therefore, Defendants' motion for summary judgment on Plaintiff's RLUIPA claim on this ground is also granted.

### 2. Attendance at Friday Services

Plaintiff alleges that Defendants Shanley and Martuscello violated his First Amendment and RLUIPA rights by denying him permission to attend weekly Jum'ah congregate services at Conxsackie Correctional Facility on three occasions while Plaintiff was in disciplinary keeplock in August 2009. Plaintiff also alleges that Defendants Robinson and Hale violated his First Amendment rights by denying him permission to attend weekly Jum'ah services at Auburn Correctional Facility while Plaintiff was in disciplinary keeplock in May 2011.

In *O'Lone v. Estate of Shabazz*, while evaluating the validity of a prison regulation limiting Muslim prisoners' ability to attend Jum'ah, the Supreme Court recognized the centrality of Jum'ah services to the Islamic faith, noting that "[t]here is no question that respondents' sincerely held religious beliefs compelled attendance at Jumu'ah." 482 U.S. 342, 345 (1987). Generally, the courts "have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." *Young v. Coughlin*, 866 F.2d 567,

570 (2d Cir. 1989). Prisoners in disciplinary confinement do not lose the right to attend religious services solely because of their confinement; "prison officials must make individual determinations on a case-by-case basis as to the need for exclusion." *Id.* (quoting *Leon v. Harris*, 489 F. Supp. 221, 225 (S.D.N.Y. 1980)); *see also Mawhinney v. Henderson*, 542 F.2d 1, 3 (2d Cir. 1976) ("[N]ot every prisoner in segregation can be excluded from chapel services; because not all segregated prisoners are potential troublemakers, the prison authorities must make some discrimination among them").

However, courts have consistently found protecting institutional security and inmate safety to be a legitimate, compelling penological interest justifying the denial of attendance at religious services. *See, e.g.*, *O'Lone*, 482 U.S. 342, 350 (finding that the regulation that forced prisoners to miss Ju'mah services was "justified by concerns of institutional order and security"); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) ("In this case, appellant was in SHU for fighting with another inmate. Given that appellant posed a threat to the safety of other prisoners and that the state forbade only congregate religious services and not his solitary practice of religion, the state's purpose was legitimate"); *Salahuddin*, 467 F.3d at 277 ("[P]rison officials must have been pursuing the interest in inmate safety when limiting [the plaintiff]'s religious exercise. The defendants' burden on summary judgment is to 'point[] to [something] in the record suggesting that the [denial of religious exercise] *was viewed as* preventing [threats to inmate safety]" (quoting *Turner*, 482 U.S. at 98)).

In this case, Plaintiff contends that Defendants denied his requests to attend Jum'ah while in keeplock pursuant to an unofficial blanket policy of denying all keeplocked prisoners' requests to attend congregate religious services. Defendants Shanley and Robinson both attested that they address each keeplocked inmate's request to attend congregated services on a case-by-case basis,

pursuant to DOCCS Directive 4202, and denied Plaintiff's requests because he was determined to have presented a threat to the operation of the facility. *See* Dkt. No. 81-22; Dkt. No. 81-31. Specifically, Defendant Shanley identified Plaintiff's disciplinary history, including threatening violent conduct, a physical interaction with a correctional officer, and creating a disturbance while being escorted to a religious service, and Plaintiff's reason for being in keeplock, which was threatening physical violence toward correction officers and urging inmates to participate in detrimental actions, as the basis for denying Plaintiff's requests. Dkt No. 81-22. Defendant Robinson indicated that he denied Plaintiff's requests because of Plaintiff's October 2010 violent conduct, fighting, and creating a disturbance and April 2010 assault of prison staff. Dkt. No. 81-31.[9] Morever, Defendant Martuscello attested that Coxsackie Correctional Facility had no blanket policy of denying keeplocked inmates' requests. Dkt. No. 81-28.

Defendants' contentions that Plaintiff's requests were denied on an individual basis are supported by Plaintiff's own exhibits, including DOCCS Directive 4202, which describes the process by which keeplocked inmates can request to attend religious services, *see* Dkt. No. 88-3 at 61; two memoranda from Defendant Shanley indicating that "[a]fter a careful review of [P]laintiff's facility records, and for the safety and security of the facility, I have denied [Plaintiff]'s request to attend Religious Services while he is on keeplock status," Dkt No. 88-3 at

---

[9]  Plaintiff argues that "*Salahuddin v. Goord* . . . rejected the practice of prison officials justifying preclusion from services due to infractions incurred at other facilities besides the one at which services are held." Dkt. No. 93-1 at 31. However, in *Salahuddin*, the Second Circuit reversed a grant of summary judgment for the defendants because they claimed they denied the plaintiff's request to attend services based on safety considerations, but "[did] not point to any record evidence that suggests that the denial of religious exercise while in disciplinary keeplock . . . was actually viewed as preventing threats to inmate safety. . . . Post hoc justifications with no record support will not suffice." 467 F.3d at 276-77. As the Court discusses below, there is ample record evidence here that Defendants' denials were actually based on safety concerns, and the Court does not read *Salahuddin* as requiring safety concerns to be based solely on an inmate's history at the facility at which he is in keeplock.

18

55, 58; and Plaintiff's grievances, Dkt. No. 88-3 at 53-54, 57. The fact that the Inmate Grievance Resolution Committee recommended that one of Plaintiff's grievances be accepted in part because Defendant Shanley should have provided Plaintiff with a fuller explanation for the basis of the denial of Plaintiff's request does not make Defendant Shanley's denial defective. Rather, the Court finds ample evidence in the record, including the above-quoted memoranda, that Defendant Shanley denied Plaintiff's requests to protect facility safety and security. The only evidence Plaintiff introduced of an implicit blanket policy of denying all keeplocked inmates' requests was his alleged conversation with Defendant Martuscello. Plaintiff's unsupported assertion is not sufficient to create a genuine issue of material fact regarding the existence of such a policy, which Defendants unanimously denied.

Finally, the Court acknowledges that Plaintiff had no alternative means of participating in Ju'mah, as Ju'mah requires congregate worship. However, the Supreme Court in *O'Lone* rejected this argument as being fatal to the reasonableness of a prison regulation restricting prisoners from attending Ju'mah that protected institutional security and explained:

> Our decision in *Turner* also found it relevant that "alternative means of exercising the right . . . remain open to prison inmates." There are, of course, no alternative means of attending Jumu'ah; respondents' religious beliefs insist that it occur at a particular time. But the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service. While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end. . . . Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies.

482 U.S. at 351-52 (citation omitted). Plaintiff's ability to worship and pray individually in his keeplock cell thus afforded him some alternative means of exercising his religious rights, and

19

Plaintiff has suggested no alternative or less restrictive means of protecting institutional security that would have permitted him to participate in Ju'mah.

Based on the foregoing, the Court finds that the burdens on Plaintiff's religious exercise were reasonably related to legitimate penological objectives, and Defendants had no less restrictive means of furthering those objectives. Defendants' motion for summary judgment on Plaintiff's First Amendment and RLUIPA claims on this issue is therefore granted.

### 3. Dietary Restrictions

Plaintiff contends that Defendants Perlman, Leonard, Hale, and Graham violated his First Amendment and RLUIPA rights by failing to incorporate halal meats into the therapeutic diet Plaintiff receives pursuant to a physician's approval.

Prison officials are required, at minimum, to provide inmates with nutritionally adequate meals, but otherwise retain "considerable discretion" over dietary decisions. *Walker v. Fischer*, No. 10-CV-01431, 2012 WL 1029614, *6 (N.D.N.Y. Mar. 26, 2012). However, the Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford*, 352 F.3d at 597 (citations omitted). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004). Even so, courts "are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." *Benjamin*, 905 F.2d at 579 (citations omitted). Further, "[c]ourts have consistently held that DOCCS' Religious Alternative Meal ["RAM"] is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required." *DeBlasio v. Rock*, No. 9:09-CV-1077, 2011 WL 4478515, *20 (N.D.N.Y. Sept. 26, 2011) (citation omitted).

In the present matter, Plaintiff currently receives the therapeutic "Controlled A" diet, which is high fiber, low cholesterol/low fat, and low sodium, at the request of Plaintiff's health care provider. The Controlled A menu contains meats that are haram, or prepared in a manner that violates the tenants of Islam. Plaintiff requested that Defendants provide him with a special diet combining the Controlled A diet with halal meats, which are prepared in a manner consistent with the laws of Islam. Defendants refused his request, noting that per the DOCCS Medical Nutritional Therapy Manual, "[r]eligious menus are not available in combination with any therapeutic diet restrictions. [M]any of the religious selections are not compatible with therapeutic diet requirements." Dkt. No. 88-3 at 85. Plaintiff contends he is thus forced to choose between a diet suited to his medical needs and one which satisfies the dictates of his religious beliefs.

Plaintiff does not contend that Islam requires him to consume halal meat with any specific frequency or indeed at all, but rather that it prohibits him from consuming haram meat. The RAM diet, which courts have consistently approved of as sufficient to meet Muslim prisoners' dietary and religious needs, only includes one halal meat entree per week. *See* Dkt. No. 81-34 at 3. Plaintiff does not dispute that he remains free to choose the RAM diet, which complies with his religious beliefs, and does not claim that he is forced to consume the haram meats on the Controlled A diet when they are provided to him.[10] However, because haram meats are a

_____

[10] Plaintiff claims that the RAM diet causes him adverse digestive and/or gastrointestinal reactions but provides no evidence in support of this claim. *See* Dkt. No. 88 at 15. Notably, Plaintiff was placed on the Controlled A diet because of his high blood sugar and creatine levels, not because of any gastrointestinal complications produced by the general population or RAM diets. *See id.* at 10. Further, in response to Plaintiff's arguments that the soy-based components of the RAM diet make the RAM diet generally unsuitable to meet prisoners' nutritional needs, the Court again notes that "[c]ourts have consistently held that DOCCS' Religious Alternative Meal ["RAM"] is sufficient to sustain Muslim prisoners' good health." *DeBlasio*, 2011 WL 4478515 at *20.

prevalent component of the Controlled A diet, and the RAM diet would not fulfill Plaintiff's specific medical needs, the Court finds that Plaintiff's religious exercise is burdened by Defendants' refusal to provide him a meal option suited to his therapeutic needs that also complies with his religious beliefs. *See* Dkt. No. 81-37 (listing two typical weekly menus for the Controlled A diet, each of which feature non-halal meats in at least twelve meals).

Defendants' refusal to serve Plaintiff a special menu combining elements of the RAM and Controlled A diets is justified by the legitimate penological concern of meeting the disparate dietary needs of approximately 54,700 inmates in an economically viable way. *See* Dkt. No. 81-6. "[I]t is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups." *Majid v. Fischer*, No. 07-CV-4585, 2009 U.S. Dist. LEXIS 71616, *18-19 (S.D.N.Y. July 31, 2009); *see also Hamilton v. Smith*, No. 9:06-CV-0805, 2009 WL 3199520, *4 (N.D.N.Y. Sept. 30, 2009) ("It is not a reasonable demand that prison officials supply every inmate with their personal diet requests for every meal" (internal quotations omitted)). There is clearly a rational relationship between this interest and the policy, which offers numerous menus tailored to meet different inmates' needs in a cost-effective manner by following a standardized state-wide menu prepared under considerations of "the palatability of the food to inmates, nutritional quality, accommodation of religious requirements and therapeutic needs, security implications, and cost containment." Dkt. No. 81-34 at 2. Defendants' refusal to permit Plaintiff to incorporate RAM entrees of his choosing into his diet also serves the legitimate purpose of maintaining the therapeutic integrity of the medical diet. For example, Elizabeth Culkin, assistant director of the DOCCS Office of Nutritional Services and a registered dietitian, attested that the halal chicken patty offered on the RAM diet that Plaintiff sought to have included in his diet was too high in sodium to meet the restrictions of the Controlled A diet. *Id.* at 5.

Second, Plaintiff does not contest that Defendants make halal meat available to Muslim prisoners, including Plaintiff, numerous times per year pursuant to special menus for religious observances. Ms. Culkin attested that Muslim inmates may also obtain halal meats to supplement their diets through care packages or their facility's commissary. Dkt. No. 81-34 at 3. Although Plaintiff alleges that halal meat is not sold at his current facility's commissary, Ms. Culkin attested that inmates may petition their facilities to have specific products sold at the commissary. *Id.* Therefore, Plaintiff has alternative means of exercising his religious beliefs.

Third, incorporating nutritionally appropriate halal entrees into the Controlled A menu would burden prison administrative and fiscal resources. Ms. Culkin attested that the cost of a single low sodium halal chicken entree suitable to the Controlled A diet is $0.78, while a single comparable non-halal chicken entree costs $0.43. *Id.* at 5. Ms. Culkin calculated that making this substitution just once per week for the 2,890 inmates currently on the Controlled A and B diets would cost DOCCS $52,598 annually. *Id.* Plaintiff contends that such a substitution would in fact cost DOCCS only $109.20 annually because only three Controlled A diet recipients at the Attica Correctional Facility are Muslim. Dkt. No. 88 at 24. However, Plaintiff provides no support for his contention that only three Muslim prisoners at his facility require a therapeutic diet, and overlooks the fact that DOCCS operates its menus on a standardized, state-wide basis in the interest of cost containment. Further, the Court agrees with the *Hamilton* court, which found that under similar circumstances, "'[e]ven where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns.'" *Hamilton*, 2009 WL 3199520 at *5 (quoting *Furnace v. Arceo*, No. C 06-4209, 2008 WL 618907, *8 (N.D. Cal. Mar. 3, 2008)).

Plaintiff's proffered alternatives to accommodate his rights include that DOCCS replace the haram proteins in all prison menus with halal proteins. Dkt. No. 88 at 26. In light of Ms. Culkin's uncontroverted assertion that halal proteins are more expensive than non-halal proteins, this option would not satisfy Defendants' legitimate penological interest in meeting prisoners' nutritional needs in a cost-effective manner. *See* Dkt. No. 81-34. A second alternative Plaintiff suggests is that DOCCS provide him with Ensure dietary supplements. Dkt. No. 88 at 27. Plaintiff has proffered no evidence that he requested such supplements or that Defendants denied him such supplements under their current policy. Finally, Plaintiff suggests that DOCCS provide Muslim inmates with prepackaged halal meals. Dkt. No. 88 at 26. Plaintiff provides no evidence that these prepackaged meals are consistent with the restrictions of his therapeutic diet, are available to DOCCS for purchase, or would be cost-effective. Thus, Plaintiff has offered no viable less restrictive means of accommodating his rights that are consistent with Defendants' valid penological interests.

For the above reasons, Defendants' motion for summary judgment on Plaintiff's free exercise and RLUIPA claims on this issue is granted.

## E.    Equal Protections Claims

Plaintiff contends that his rights under the Fourteenth Amendment were violated by Defendants Perlman and Leonard when DOCCS reduced the number of Islamic holy days designated as family events but did not similarly reduce the number of Native American religious family guest events. Plaintiff also contends that Defendants Perlman, Leonard, Hale, and Graham violated his rights when they refused to incorporate halal meats into Plaintiff's therapeutic diet but provided Jewish inmates kosher meals "satisfying both their medical and religious needs." Dkt. No. 47 at 17-18; Dkt. No. 47-4 at 10.

The Fourteenth Amendment to the United States Constitution provides in relevant part that "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To prove a violation of the Equal Protection Clause, . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). In the prison context, "the Supreme Court has specifically held that . . . the Equal Protection clause does not require that 'every religious sect or group within a prison . . . must have identical facilities or personnel.'" *Pugh*, 571 F. Supp. 2d at 502 (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)). The Second Circuit has applied the *Turner* standard to equal protection claims, such that "even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Benjamin*, 905 F.2d at 572). This standard requires courts to "determine whether 'the groups are so similar that discretion has been abused.'" *Benjamin*, 905 F.2d at 575 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)).

### 1. Family Guest Events

In this case, Plaintiff claims that Defendants violated his equal protection rights by reducing the number of religious events at which family guests are permitted for Muslim inmates but not Native American inmates. It is undisputed that under the new policy, DOCCS reduced the number of religious events designated as family guest events to one event per year for all recognized religions except the Native American religion. Defendants argue that the exception for Native Americans is justified because in 1999, DOCCS agreed by stipulation to designate eight Native American holy days as family guest events, pursuant to DOCCS' recognition that

"Native Americans believe that family . . . is important to the religious celebration and for that reason it does not separate religiously from family celebrations and allows the eight sacred seasonal holy days of the Longhouse to be celebrated in a unique way as described herein." *See* Dkt. No. 81-4 at 12.

Plaintiff contends that Muslim and Native American inmates are similarly situated because both "require family and guest participation as integral aspects of their holy day celebrations." Dkt. No. 93-1 at 58. On the other hand, Plaintiff asserts that Muslim inmates and the other religious groups that had family event days reduced are not similarly situated because the other religious groups "do not have any set holy day as a family event, but decide which ones they will celebrate as such at some time throughout the year." *Id.* at 59.[11] Defendant Leonard acknowledged in his response to Plaintiff's interrogatories that the DOCCS Muslim Chaplains objected to the reduction in family events because "religious holidays can be considered family days." Dkt. No. 88-3 at 47. However, Defendant Hale indicated that the decision to reduce all religious groups to one family guest event was made after Defendant Perlman "determined that having only one family day event in no way limited the religious practices of the inmate population of any religious faith." *Id.* at 21. This statement is consistent with the denial of Plaintiff's grievance regarding the change in family event policy, which stated, in relevant part:

> Per Ministerial Services, Central Office allows one family event per year, with the exemption of the Native American faith group. A Native American religious ceremony is observed with a family

---

[11] Plaintiff's evidence in support of this claim is his own recounting of personal conversations he had with Protestant and Catholic inmates, *see* Dkt. No. 88 at 33-34, the fact that the annual holy day given family event status for the Protestant and Catholic religions can vary annually, *see* Dkt. No. 88-3 at 157, 161, and a page from a text by Dr. Mandouh N. Mohamed, an associate professor at American Open University, which states that one common error concerning the celebration of Eid-ul-Adha Muslims may make is "[n]ot accompanying family members to attend Eiid," Dkt. No. 88-3 at 102.

> meal. The other religions do not require a family meal as part of the
> religious observance. Other religious holidays can be observed
> without a family event scheduled.

Dkt. No. 73-3 at 31. Defendants have consistently justified the policy's different treatment of

Native American inmates and inmates practicing all other recognized religions as based on a

legitimate penological interest of accommodating what DOCCS perceives as a unique need to

incorporate family members into Native American religious celebrations, pursuant to a stipulation

DOCCS has adhered to since 1999. This interest is rationally related to the DOCCS policy

exception for Native American holy days. Plaintiff has introduced no evidence that Defendants'

refusal to permit a similar exception for Muslims was the result of intentional or purposeful

discrimination.

Morever, Plaintiff has failed to introduce any evidence demonstrating that he is so

similarly situated with the Native Americans such that Plaintiffs abused their discretion.

Accordingly, the Court has no basis for finding that Defendants abused their discretion in

adhering to a stipulation recognizing eight annual family guest events for Native American

inmates. Therefore, Defendants' motion for summary judgment on this ground is granted.

### 2. *Dietary Restrictions*

Plaintiff also contends that Defendants violated his equal protection rights by refusing to

incorporate halal proteins from the RAM diet into Plaintiff's therapeutic diet while providing

Jewish inmates the "hot kosher" meal option at Green Haven Correctional Facility. Plaintiff

claims that the hot kosher program is provided to Jewish prisoners whose medical needs render

the standard kosher menu, known as the Cold Alternative Diet ("CAD"), inappropriate. However,

Plaintiff proffered no evidence in support of his claim that the hot kosher diet satisfies both the

religious and dietary needs of Jewish inmates requiring specific therapeutic diets, as Plaintiff

requires. The record establishes only that the hot kosher meal program satisfies the Jewish dietary doctrine, and is devoid of any evidence that the program satisfies specific medical needs not met by the CAD. *See* Dkt. No. 88-3 at 22. In fact, an internal DOCCS communication regarding the Green Haven hot kosher program offered by Plaintiff as evidence of disparate treatment indicates that the program is intended for "more observant and religiously astute" inmates, not inmates requiring therapeutical diets. Dkt. No. 88-3 at 98. Similarly, DOCCS Directive 4202 describes eligibility to participate in the hot kosher program as "based upon past religious history and approval by the Office of Ministerial and Family Services," not medical concerns. *Id.* at 108. Further, the record indicates that all religious diets are strictly followed and cannot be combined with therapeutic menus, with no exception for Jewish inmates or reference to the hot kosher diet as a means of accommodation. *See* Dkt. No. 88-3 at 23, 29, 77. In the absence of any support for Plaintiff's unsubstantiated claim that Jewish inmates with medical dietary needs receive a special diet that accommodates their specific therapeutic and religious needs, Plaintiff has failed to show any disparity in treatment and raises no genuine issue of material fact on his equal protection claim. Based on the foregoing, the Court grants Defendants' motion for summary judgment on this ground.

## F. Qualified Immunity

Defendants contend that even if Plaintiff established a constitutional violation, they are entitled to qualified immunity. Qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).

> For a constitutional right to be clearly established for purposes of determining whether an officer is entitled to qualified immunity, the

> contours of the right must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.
> This is not to say that an official action is protected by qualified
> immunity unless the very action in question has previously been
> held unlawful, but it is to say that in the light of pre-existing law the
> unlawfulness must be apparent.

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S.
635, 638 (1987)) (internal quotations and emphasis omitted).  "Where the right at issue in the
circumstances confronting [the government officials] . . . was clearly established but was violated,
the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable
for them to believe their acts did not violate those rights.'"  *Zellner v. Summerlin*, 494 F.3d 344,
367 (2d Cir. 2007) (quotation and other citation omitted).

    "Although a mere mistake in the performance of an official duty may not deprive the
officer of qualified immunity, the doctrine does not shield performance that either (a) was in
violation of clearly established law, or (b) was plainly incompetent."  *Manganiello v. City of New
York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted).  "With respect to both the legal
question and the matter of competence, the officials' actions must be evaluated for objective
reasonableness. . . .  That is, '[e]ven if the right at issue was clearly established in certain respects
. . . an officer is still entitled to qualified immunity if "officers of reasonable competence could
disagree" on the legality of the action at issue in its particular factual context.'"  *Id.* (quotations
omitted).

    The determination of whether an official's conduct was objectively reasonable is a mixed
question of law and fact.  *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374
F.3d 93, 109 (2d Cir. 2004)) (other citations omitted).

> The ultimate question of whether it was objectively reasonable for
> the officer to believe that his conduct did not violate a clearly
> established right, *i.e.*, whether officers of reasonable competence

could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'

*Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

In the present matter, Magistrate Judge Hummel concluded that because Plaintiff's allegations did not show that Defendants violated Plaintiff's constitutional rights, Defendants are entitled to qualified immunity. Upon review, the Court finds no clear error or manifest injustice and adopts this portion of the Report-Recommendation and Order.

In addition, the Court finds that a reasonable official would not believe that he was violating Plaintiff's clearly established constitutional rights by the conduct described here. As to the family guest events, Defendants reduced the number of family event days for all religions, with the exception of the Native American religion, because of the increased number of requested family events, their associated costs, and the limited number of available weekends on which to hold the events. The exception for the Native American religion was made because of a stipulation in place and the centrality of family participation to Native American religious

holidays.  In light of these legitimate penological interests, a reasonable official would not conclude that implementing or following the policy violated Plaintiff's constitutional rights.

As to Plaintiff's restriction from Jum'ah, an inmate's general right to attend congregate religious services is clearly established.  However, a prison's ability to restrict that right based on legitimate security concerns is also well-established.  The law requires an individual determination of the risk a keeplocked inmate poses to security.  Therefore, a reasonable official would not understand denying Plaintiff's requests to attend Jum'ah while in keeplock to violate Plaintiff's rights where Defendant made individual determinations that Plaintiff posed a threat to facility security.

As to the failure to incorporate halal meals into Plaintiff's therapeutic diet, an objectively reasonable officer would not believe that the options provided to Plaintiff violated his rights.  This finding is supported by the fact that the RAM diet is widely accepted by courts as nutritionally and religiously appropriate for Muslim inmates, by the availability of other sources of halal meat to Plaintiff, and by the uniform manner in which DOCCS prohibited combinations of therapeutic and religious diets.

Based on the foregoing, the Court finds that Defendants are entitled to qualified immunity, and grants Defendants' motion for summary judgment on this alternative ground.

**G.      Preliminary Injunctive Relief**

Finally, Magistrate Judge Hummel concluded that Plaintiff was not entitled to a temporary restraining order or preliminary injunction.  The Court has reviewed Magistrate Judge Hummel's reasoning and conclusion on this issue and finds no clear error.  Accordingly, this portion of the Report-Recommendation is adopted and Plaintiff's motion for a temporary restraining order and preliminary injunction is denied.

# V. CONCLUSION

For the reasons stated above, the Court arrives as the same conclusions as Magistrate Judge Hummel as to the proper disposition of the parties' respective motions on full review and incorporation of Plaintiff's opposition papers. Although the Court disagrees with Magistrate Judge Hummel's recommendation regarding the personal involvement of Defendant Martuscello, the Court's finding on this issue does not alter the Court's conclusion that Defendants are entitled to summary judgment on all counts of Plaintiff's complaint. Therefore, the Court hereby

**ORDERS** that Plaintiff's motion for reconsideration is **GRANTED** and the Court's Order dated March 13, 2014 is **VACATED**; and the Court further

**ORDERS** that the Report and Recommendation by United States Magistrate Judge Christian F. Hummel (Dkt. No. 90) is rejected in part and accepted in part for the reasons set forth herein; and the Court further

**ORDERS** that Plaintiff's motion for partial summary judgment (Dkt. No. 73) is **DENIED**; and the Court further

**ORDERS** that Defendants' cross motion for summary judgment (Dkt. No. 81) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's motion for a temporary restraining order and preliminary injunction (Dkt. No. 79) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: December 18, 2014
        Albany, New York

                                 Mae A. D'Agostino
                                 U.S. District Judge